UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALLISON GIORGIO, ASHLEY RODRIGUEZ, JENNIFER TORRES, NANCY OWEN, ANTOINETTE WACHTL, individually and on behalf of all other similarly situated,

Plaintiffs,

-against-

WW INTERNATIONAL, INC., WW.COM, LLC WEEKEND HEALTH OF TEXAS, PA, WEEKEND HEALTH OF NEW JERSEY P.C., WEEKEND HEALTH OF PENNSYLVANIA, P.C., AND BRANTLEY T. JOLLY, M.D., PROF. CORP.,

Defendants.

Case No.: 1:25-CV-02944-RA

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT**

## I. PRELIMINARY STATEMENT

The Opposition goes to extreme lengths to avoid dismissal, including by misrepresenting and/or disavowing WW's Privacy Policy, its arguments, and even Plaintiffs' own Complaint.[1] But Plaintiffs cannot escape that they agreed to the Privacy Policy, mandating dismissal of all their claims. For this and the further reasons below, the entire Complaint should be dismissed with prejudice.

## II. THE COMPLAINT SHOULD BE DISMISSED

### A. Plaintiffs' Consent Causes Their Claims To Fail

#### 1. *Plaintiffs Agreed To The Privacy Policy*

Plaintiffs agreed to the Privacy Policy when signing up for their WW memberships in two ways: first, by checking a box; and second, by ultimately creating their accounts and purchasing their memberships. (Mot. at 6-9.) Plaintiff Wachtl further agreed to the Privacy Policy when she took the Clinic Questionnaire. (Compl. ¶ 48.)

In the Opposition, Plaintiffs contend they did not assent because they weren't required to check a box. (Opp. at 6-7.) But they were required to:




[1] Capitalized terms have the same meaning as in the Motion.

(Mot. at 7.) The middle box applies to both the sentence beginning with "You are" and the next sentence beginning with "You acknowledge." (*Id.*) Thus, Plaintiffs assented when they checked the middle box. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

Even if the Court disagrees, Plaintiffs still assented by clicking the "Next Step" button and creating their accounts. While Plaintiffs contend they could not have assented because "nothing distinguish[ed]" the Privacy Policy in the signup flow, (Opp. at 7), this ignores that the Privacy Policy appeared in bold, purple font, unlike the surrounding font. *Meyer*, 868 F.3d at 78 (holding that hyperlink to terms of service was reasonably conspicuous because it appeared in underlined blue font). The law did/does not require that WW had/have an "I agree" checkbox to obtain consent. *Id.* at 76 (plaintiff assented to terms of service by clicking "register" button); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (same re "Shop Now" button). Finally, Plaintiffs' reliance on *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) is misplaced. (Opp. at 7.) There, the sign-up screen was cluttered with "between fifteen and twenty-five links, text in at least four font sizes and six colors," "several buttons and advertisements," and a link to the privacy policy not near the "button intended to manifest assent to the terms." *Meyer*, 868 F.3d at 78 (cleaned up). Plaintiffs agreed to the Privacy Policy, and their claims should be dismissed.

Plaintiffs argue that Wachtl did not assent to the Privacy Policy when taking the Clinic Questionnaire because the Privacy Policy was not noticeable. (Opp. at 6.) Not so. The Policy was hyperlinked, underlined, and presented on a non-cluttered page directly above the "Next" button. (Mot. at 9.) *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830-31 (S.D.N.Y. 2020) (holding that hyperlink to the defendant's terms of use was reasonably conspicuous because it

was bolded and on a non-cluttered page). Moreover, Plaintiffs ignore that Wachtl was presented with a link to the Privacy Policy on the first page of the Clinic Questionnaire *and* a disclosure that stated she agreed to her "health and other data" being shared with "third-party providers" and used for "marketing purposes" by proceeding with the questionnaire. (Mot. at 7-9.) Thus, Wachtl assented by taking the Clinic Questionnaire.

**2. *The Privacy Policy Disclosed That Data Would Be Shared***

Plaintiffs argue that the Privacy Policy did not provide adequate disclosure of data sharing, but this ignores that WW's Privacy Policy (all iterations) disclosed that it collected "personal information," including "health" information and "user submitted content," such as "questionnaires." (Cai Decl., Exs. A-D.) The Policy also disclosed that personal information was shared with "Analytics, Advertising, and Social Media Platforms and Networks." (*Id.*) Thus all three of Plaintiffs' counter-arguments fail:

*First*, Plaintiffs contend that the sign-up flow promises users that WW "will 'process health related data' only 'to the extent necessary for the provision of the tools and function of WW products" and that users interpret this to mean that WW "only uses health-related data for thi[s] specified limited purpose and nothing else, i.e., it does not disclose it to third parties." (Opp. at 7 [emphasis added].) Plaintiffs misrepresent the signup flow by inserting the word "only," which is never used. Instead, it states that "WW ***may*** process health related data . . . to the extent necessary . . . ." (Cai Decl. ¶ 10 [emphasis added].) Users would interpret this to mean that this is just one, but not the only, way that WW "may" process their health-related data. Plaintiffs also unreasonably interpret the signup flow as promising to not "disclose" health data. (Opp. at 7 [emphasis added].) But, again, that is not what the sign-up flow states, and "may process" does not equate to a promise to not "disclose." Finally, Plaintiffs ignore that on

the sign-up screen users are also presented with a link to the Privacy Policy in bold, purple font. The Privacy Policy, in turn, cures any purported ambiguity by expressly stating in bold, capitalized font that health information may be shared with third parties, as further described below.

*Second*, Plaintiffs argue that WW's disclosure at the beginning of the Clinic Questionnaire (below), leads users to believe that the "third-party providers" are "medical doctors, other facilities, and health plans." (Opp. at 8.) But there is no support for their interpretation, and it does not make sense for WW to share health data with Plaintiffs' doctors for "marketing purposes." Plaintiffs' reference to WW's "Notice of Privacy Practices" to support their argument is misleading. (*Id.*) As explained in the Motion, that policy does not govern the Clinic Questionnaire. (Mot. at 11.) Indeed, the Clinic Questionnaire hyperlinks to WW's Privacy Policy, not the Notice of Privacy Practices.




*Third*, Plaintiffs argue that there is "no mention of WW disclosing identifiable health data in the Privacy Policy" or WW "sharing individually identifiable health data" to third parties for targeted advertising. (Opp. at 8-9.) This is a misrepresentation of the Privacy Policy. Under the heading, "**WHAT INFORMATION DO WE COLLECT?**," WW states that it collects "personal information," including "***Health Information***." (Cai Decl. Exs. A-D.)[2] Then, under the heading, "***WHEN DO WE DISCLOSE INFORMATION TO THIRD PARTIES?***," WW

[2] The November 2023 Privacy Policy uses the term "Health and Fitness App Information," and the May 2024 Privacy Policy uses the term "Health and Fitness Information." (Cai Decl. ¶¶ 22-23, Exs. C-D.)

states it "share[s] personal information with the following third parties: … ***Analytics, Advertising, and Social Media Platforms and Networks***." (*Id.*) Under that heading, WW states that information gathered through "cookies" and "pixels" is shared with "third-party web analytics providers, advertising networks, and social media platforms . . . to provide you with advertisements that we and/or these third parties believe will be relevant to you." (*Id.*) These disclosures demonstrate that WW notified Plaintiffs that it used tracking technologies and that the technologies would share their health data and questionnaire responses with third parties for marketing purposes. All of Plaintiffs' claims should therefore be dismissed.

**B. Plaintiffs Lack Standing To Assert GBL Or CIPA Claims**

***GBL***. Plaintiffs cannot assert a GBL claim because they do not allege they were deceived in New York or that their WW membership purchases occurred in New York. (Mot. at 11-13.) Plaintiffs dispute this, arguing that a transaction occurred in New York because WW operates its Websites from a New York headquarters, and Plaintiffs' purchases of their WW memberships were executed on the Websites. (Opp. at 10.) They further argue that WW's Terms & Conditions contain a New York choice-of-law clause. (*Id.*) But Plaintiffs do not actually allege any of this. Plaintiffs rely on a single, conclusory paragraph in their "Jurisdiction and Venue" section which alleges that WW (defined as all Defendants) "incorporated the Tracking Technologies in this District" and "received and disclosed" Plaintiffs' data "in this District." (Compl. ¶ 17.) That is not sufficient. *Kaufman v. Sirius XM Radio, Inc.*, 474 F. App'x 5, 7 (2d Cir. 2012). For instance, Plaintiffs fail to allege that all Defendants are actually domiciled in New York. Plaintiffs also fail to allege that the servers hosting the Websites are located in New

York, and do not allege that the WW personnel who operate the Websites do so from New York.[3] They also do not allege that their membership plan payments were executed in New York; they merely allege that users can "make payments" on the Websites (Compl. ¶ 63). Plaintiffs lack standing for these reasons alone. [4]

Even if Plaintiffs had plausibly alleged that the Websites were operated in New York, this still would be insufficient because courts routinely hold that a website operated in New York does not confer GBL standing. *Wheeler v. Topps Company, Inc.*, 652 F. Supp. 3d 426, 431 (S.D.N.Y. 2023); *Silva v. Smucker Nat. Foods, Inc.*, 2015 WL 5360022, at *10 (E.D.N.Y. Sept. 14, 2015). Plaintiffs' cited cases are distinguishable because they included additional facts demonstrating a connection to New York beyond a website and choice-of-law clause. *Polk v. Del Gatto, Inc.*, 2021 WL 3146291, at *10 (S.D.N.Y. July 23, 2021) (defendant received "payments and jewelry at . . . its New York office," "processe[d] sales through . . . its New York office," and "sends and withholds payments from its New York location"); *Ward v. TheLadders.com, Inc.,* 3 F. Supp. 3d 151, 168 (S.D.N.Y. 2014) (defendant "maintained its bank account in New York").[5] Accordingly, Plaintiffs' GBL claim should be dismissed.

***CIPA***. Plaintiffs Giorgio, Rodriguez, Torres, and Wachtl cannot assert a CIPA claim because they are not California residents and were not in California when their CIPA claim accrued. (Mot. at 13.) Plaintiffs dispute this, arguing that some of the Website Vendors are

---

[3] This may not be amendable. WW's VP of Engineering is located in San Francisco, for instance. (Dkt. 49-2, p. 10.)

[4] If the Court accepts that the New York choice-of-law clause applies, then it must dismiss Plaintiffs' CIPA claims and Owen's common law claims.

[5] While *Gutierrez v. Lemonade, Inc.*, 2022 WL 3214852 (S.D.N.Y. Aug. 9, 2022) held that transactions "consummated on a website" operated by a New York company with a New York choice-of-law clause established standing, it is contrary to the weight of authority (*see* Mot. at 12-13).

headquartered in California and thus received Plaintiffs' communications in California. (Opp. at 15-16.) Their argument fails for two reasons. First, they offer no caselaw that supports their position, as they do not cite any case holding that a non-California plaintiff can assert a CIPA claim against a non-California defendant. *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011) (holding that "non-Californians" could "pursue [CIPA] claims against *California* residents" (emphasis added)). None of the Defendants are California residents.

Second, Plaintiffs did not allege the necessary ties to California to state this claim: they did not allege the purported interception took place in California, that the Website Vendors are located in California, nor allege that a scheme to track Plaintiffs' communications was designed and effectuated in California. (Opp. at 15.) Tellingly, Plaintiffs don't cite to a single allegation in the Complaint in advancing this argument. This makes sense because Plaintiffs alleged that the relevant CIPA conduct—the interception of their communications—occurred in their "web browsers," which were located on Plaintiffs' devices in Florida. (Compl. ¶ 186.) A California district court recently dismissed non-California plaintiffs' CIPA claims for the same reasons. *DellaSala v. Samba TV, Inc.*, 2025 WL 3034069, at *3 (N.D. Cal. Oct. 30, 2025) (plaintiffs did not allege that the California defendant intercepted their communications in California; it was not sufficient to rely on the defendant's California residency and that the defendant "stor[ed]" intercepted data "on its own systems").

Recognizing that they lack standing, Plaintiffs alternatively argue that the Court should wait until after discovery to determine whether any wrongful conduct occurred in California. (Opp. at 15.) But Plaintiffs are the masters of their Complaint, and they did not allege any facts

concerning where the underlying conduct occurred; thus, there is no disputed "factual question." (*Id.*) The CIPA claim can be decided now and should be dismissed.[6]

**C. Plaintiffs' Claims Fail For Additional Reasons**

***1. Plaintiffs' GBL Claim Fails***

Plaintiffs' GBL claim fails because Plaintiffs do not allege a deceptive representation or omission, nor that they saw a misrepresentation.[7] (Mot. at 14-15.)

***Deceptive representation or omission***. Plaintiffs argue that they alleged a deceptive omission because WW did not disclose that "it was secretly transmitting consumers' private health data or that this data would be used … for targeted advertising." (Opp. at 12.) And, they argue that they alleged a deceptive representation because WW promised it would not use their information without their written permission. (*Id.*) But as explained in Section A, WW disclosed everything Plaintiffs complain of in its Privacy Policy and WW never made these other promises. This distinguishes all the cases that Plaintiffs rely on, which concern situations where defendants did not adhere to the promises made in their privacy policies. (*Id.*)

***Seeing the misrepresentation***. Plaintiffs offer several flawed arguments on this topic: First, Plaintiffs attempt to avoid their failure to allege that they saw a misrepresentation by asserting that WW somehow conceded the issue. (Opp. at 13.) WW disputes any concession was made, and also, Plaintiffs cannot sidestep their pleading burden in this manner. *Grossman v. GEICO Cas. Co.*, 2022 WL 1656593, at *3 (2d Cir. May 25, 2022) (affirming dismissal of GBL claim because the plaintiff did "not allege that they saw GEICO's advertisements"). They also

---

[6] Plaintiffs served 7 third-party subpoenas on the putative Vendors; 4 were served on registered agents in Delaware; 2 in California; and 1 in Oregon.

[7] Plaintiffs fail to allege causation and their claim is barred by consent for the reasons explained in the Motion. (Mot. at 15.)

argue that they do not need to allege they saw any statement in WW's Privacy Policy because they sufficiently allege "why the policies are allegedly misleading." (Opp. at 13 n. 9.) But, the Complaint contains no such allegations concerning WW's Privacy Policy. Finally, Plaintiffs argue they can assert a GBL claim on an omission theory because "the failure to provide sufficient notice of the disclosure of protected health information is itself actionable, deceptive conduct." (Opp. at 13 [cleaned up].) Even if true, WW provided notice (*see* Section A).

### 2. *Plaintiffs' ECPA Claim Fails*

Unable to address the Motion arguments head-on (Mot. at 15-19), Plaintiffs abandon their allegations directly discussing the crime-tort exception (Compl. ¶ 178) and instead argue that WW's criminal or tortious purpose was "to monetize and use [Plaintiffs'] data." (Opp. at 23 [citing Compl. ¶¶ 54, 78, 209].) This of course is not itself a crime or tort, thus Plaintiffs pile on that the use of intercepted data for advertising could constitute an invasion of privacy. The fundamental flaw in their already attenuated argument is that Plaintiffs did not allege any of this. Plaintiffs also attempt to analogize to caselaw holding that the use of HIPAA-protected health information for advertising constitutes a tort. (Opp. at 21.)[8] Plaintiffs, however, failed to allege that their questionnaire responses contained HIPAA-protected information. While Plaintiffs argue that WW is a "HIPAA-covered entity by virtue of the clinical services it provides" (Opp. at 22), only Plaintiff Wachtl alleges she signed up for those services, and she does not allege that the Clinic Questionnaire was protected by HIPAA. Accordingly, Plaintiffs did not plausibly allege that WW had a criminal or tortious purpose, so their ECPA claim must be dismissed.

---

[8] Plaintiffs contend that WW "falsely" claimed these cases concerned a defendant's interception and disclosure to a third party. (Opp. at 22.) Their contention is easily disproven as WW's case stated that the "Defendant[] intercept[ed] and transmitt[ed]" the plaintiffs data "to Facebook, Google, and others." *Gay v. Garnet Health*, 2024 WL 4203263, at *3 (S.D.N.Y. Sept. 16, 2024).

### 3. *Plaintiffs' CIPA Claim Fails*

***First clause***. Plaintiffs do not contest, and therefore concede, that they cannot allege a CIPA claim premised on the first statutory clause.

***Second clause***. Plaintiffs do not contest that they failed to allege that the Website Vendors read, attempted to read, or otherwise learned the contents of their questionnaire responses in transit. (Mot. at 20-21.) Instead, they argue that it is enough to allege that the Website Vendors "capture[d]" their communications while in transit. (Opp. at 16, 18.) Not only does this ignore Cal. Penal. Code § 631(a)'s plain language, it ignores that multiple courts have interpreted the second clause as *requiring* that the third party read, or attempted to read, the intercepted communications in transit.[9] (Mot. at 20-21.) Plaintiffs' argument that these courts' interpretation of CIPA "can't be correct" because it "would exclude … persons who wiretapped … telephone and telegraph lines" (Opp. at 18) ignores that CIPA's first clause would cover that scenario. Cal. Penal Code § 631. Finally, Plaintiffs' cases are distinguishable, and more recent decisions have held that WW's interpretation of the second clause "makes more sense" because CIPA should be construed "narrowly," given that it is a criminal statute. *Doe v. Eating Recovery Ctr. LLC*, 2025 WL 2971090, at *1, *6 (N.D. Cal. Oct. 17, 2025). Plaintiffs have failed to allege a violation of the second clause.

***Third clause***. Because Plaintiffs have not alleged a violation of the first or second clause, they also have not alleged a violation of the third clause.

---

[9] Plaintiffs' argument that these cases are distinguishable because they were decided on summary judgment fails: it ignores that both motion types address the elements required to state (or prove) a claim.

***Fourth clause***. Plaintiffs fail to allege that WW intentionally installed tracking technologies so that the Website Vendors could read, attempt to read, or learn the contents of questionnaire responses in transit. (Mot. at 22-23.) Plaintiffs do not challenge this, arguing instead that WW "undoubtedly knew how the technology … worked." (Opp. at 21.) Regardless of this *non sequitur*, what they *alleged* was that the incorporation of tracking technologies "would result in the disclosure" of Plaintiffs' data to third-parties and that the third-parties provided WW "with analytics about the data." (Compl. ¶¶ 56-57, 85, 93, 101.) These allegations are insufficient because they do not rise to a CIPA violation of reading or attempting to read communications in transit. *Smith v. YETI Coolers, LLC*, 2025 WL 877127, at *1 (N.D. Cal. Mar. 14, 2025). Plaintiffs' further argument that regulators warned that tracking technologies could violate HIPAA and that WW was sued in a different case is unavailing because neither concerned CIPA. Plaintiffs fail to state a violation of the fourth clause.

**4. *Plaintiffs' Invasion Of Privacy Claim Fails***

Plaintiffs concede they cannot assert invasion of privacy claims under New York or Florida law. (Opp. at 24 n.19.) Owen's California claim fails because she does not plausibly allege an intrusion or a reasonable expectation of privacy. (Mot. at 24.) Owen does not contest that she failed to allege an intrusion; instead, she argues that an invasion of privacy claim can be based on an unlawful disclosure. (Opp. at 25.) But she has not alleged the "publicity" element of such a claim, which requires "that the matter must be regarded as substantially certain to become one of public knowledge." *Hassan v. Facebook, Inc.*, 2019 WL 3302721, at *3 (N.D. Cal. July 23, 2019).[10] Further, her argument that she has alleged a reasonable expectation of

[10] Plaintiffs' cases are distinguishable because the defendants in those cases did not argue that a *disclosure* of data does is not an *intrusion*. (Opp. at 24.)

privacy fails because she consented to the disclosure; and as to her cited cases, these involved involuntary data breaches (one of which included public posting of the stolen data, *see Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 905 (S.D. Cal. 2020)). Owen's claim should be dismissed.

**5. *Plaintiffs' Unjust Enrichment Claim Fails***

Plaintiffs' unjust enrichment claim should be dismissed because they have an adequate legal remedy, money damages. (Mot. at 25.) Plaintiffs' assertion that they lack a legal remedy because they seek disgorgement of profits fails because Plaintiffs don't "explain *why* legal remedies are inadequate in their pleading," as required. *Molayem v. Ralph Lauren Corp.*, 2025 WL 2773290, at *6 (S.D.N.Y. Sept. 29, 2025).

**D. <u>The Complaint Fails To Satisfy Rule 8</u>**

The Complaint must be dismissed under Rule 8. First, Plaintiffs cannot rely on WW's Privacy Policy to justify group pleading; they must "make factual allegations that distinguish between the conduct of the [defendants]." *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015). Second, WW is not arguing that Plaintiffs must "plead every bad act on every WW site." (Opp. at 5.) Rather, Plaintiffs must specify whether they visited and purchased their memberships on www.weightwatchers.com or www.joinsequence.com. Third, Plaintiffs' "observations from the WW sites" regarding the "other tracking technologies" are insufficient because Plaintiffs do not allege specific facts about those technologies. (Opp. at 6.)

## III. CONCLUSION

The Complaint should be dismissed with prejudice.

DATED: November 20, 2025

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP

By: */s/ P. Craig Cardon*

P. Craig Cardon (Admitted Pro Hac Vice)
Kevin Murphy (Admitted Pro Hac Vice)
1901 Avenue for the Stars, Suite 1600
Los Angeles, California 90067
Telephone: (310) 228-3700
ccardon@sheppardmullin.com
kemurphy@sheppardmullin.com

Abby Meyer (Admitted Pro Hac Vice)
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626-1993
Telephone: (714) 513-5100
ameyer@sheppardmullin.com

Sylvia Waghorne
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: (212) 653-8700
Swaghorne@sheppardmullin.com

*Attorneys for Defendants*
*WW International, Inc., WW.Com, LLC Weekend Health of Texas, PA, Weekend Health of New Jersey P.C., Weekend Health of Pennsylvania, P.C., and WeightWatchers Clinic f/k/a Brantley T. Jolly, M.D.*

**WORD COUNT LIMIT CERTIFICATION**

I, P. Craig Cardon, hereby certify that the foregoing memorandum law complies with the word count limit set forth in S.D.N.Y. Local Civil Rule 7.1(c) and Section 4.A of the Individual Rules & Practices in Civil Cases of Hon. Ronnie Abrams. According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 3,499 words in the document.

*/s/ P. Craig Cardon*
P. Craig Cardon