**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

ALLISON GIORGIO, ASHLEY RODRIGUEZ, JENNIFER TORRES, NANCY OWEN, ANTOINETTE WACHTL, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

WW INTERNATIONAL, INC., WW.COM, LLC WEEKEND HEALTH OF TEXAS, PA, WEEKEND HEALTH OF NEW JERSEY P.C., WEEKEND HEALTH OF PENNSYLVANIA, P.C., AND BRANTLEY T. JOLLY, J.D., PROF. CORP.,

Defendants.

Case No. 1:25-cv-02944-RA

Hon. Ronnie Abrams

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL INDIVIDUAL ARBITRATION**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

I. The WW Sign-Up Process as of December 31, 2024 ........ 2

II. Subsequent Changes to the WW Sign-up Process Confirm Prior Inadequacy ........ 6

CHOICE OF LAW ........ 9

LEGAL STANDARD ........ 10

ARGUMENT ........ 11

III. The Operative Membership Agreement Did Not Contain an Arbitration Provision ........ 11

IV. WW Cannot Show Notice and Assent to the Non-Operative Hyperlinked Terms ........ 12

V. The Scope of the Arbitration Provision Is Not an Issue for the Arbitrator ........ 17

VI. Plaintiffs' Claims Do Not Fall Within the Scope of the Non-Applicable Arbitration Clause ........ 19

VII. The Class Action Waiver Is Equally Unenforceable ........ 22

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*,
645 F.3d 522 (2d Cir. 2011) .......... 11

*Armor All/STP Prods. Co. v. TSI Prods., Inc.*,
337 F. Supp. 3d 156 (D. Conn. 2018) .......... 18, 21

*AT&T Technologies, Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) .......... 21

*Bennett v. Barclays Bank Delaware,*
No. 24 CIV. 6549, 2025 WL 2690390 (S.D.N.Y. Sept. 19, 2025) .......... 11

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 10, 13, 15, 16

*Bischoff v. DirecTV, Inc.*,
180 F. Supp. 2d 1097 (C.D. Cal. 2002) .......... 11

*Brooks v. Yang*,
216 A.D.3d 505 (1st Dep't 2023) .......... 17

*Cape Flattery Ltd. v. Titan Mar., LLC,*
647 F.3d 914 (9th Cir. 2011) .......... 17

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
No. 08–cv–5463 (CM)(GWG), 2011 WL 744732 (S.D.N.Y. Mar. 1, 2011) .......... 16

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... 13, 15

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
990 F.3d 173 (2d Cir. 2021) .......... 20

*Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.,*
429 F. Supp. 2d 582 (S.D.N.Y.) .......... 12

*Dasher v. RBC Bank (USA),*
745 F.3d 1111 (11th Cir. 2014) .......... 10, 12

*Davitashvili v. Grubhub Inc.*,
131 F.4th 109 (2d Cir. 2025) .......... 20

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
6 F.4th 308 (2d Cir. 2021) .......... 18

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) .......... 16

*Foster Wheeler Env't Corp. v. EnergX TN, LLC*,
No. 13 CIV. 1178 RA, 2014 WL 982857 (S.D.N.Y. Mar. 13, 2014) .......... 22

*FUJIFILM N. Am. Corp. v. Geleshmall Enters. LLC*,
239 F. Supp. 3d 640 (E.D.N.Y. 2017) .......... 20

*In re Checking Acct. Overdraft Litig.*,
915 F. Supp. 2d 1334 (S.D. Fla. 2013) .......... 11, 12

*Lapina v. Men Women N.Y. Model Mgmt. Inc.*,
86 F. Supp. 3d 277 (S.D.N.Y. 2015) .......... 18

*Lewis v. Samsung Elecs. Am., Inc.*,
2023 WL 7623670 (S.D.N.Y. Nov. 14, 2023) .......... 16

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) .......... 17

*Microsoft Corp. v. Samsung Elecs. Co.*,
60 F. Supp. 3d 525 (S.D.N.Y. 2014) .......... 20

*Mullo v. DoorDash, Inc.*,
No. 22-CV-2430 (VEC), 2023 WL 1971897 (S.D.N.Y. Jan. 17, 2023) .......... 22

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
770 F.3d 1010 (2d Cir. 2014) .......... 17, 18

*Nicosia v. Amazon.com, Inc.*,
384 F. Supp. 3d 254 (E.D.N.Y. 2019) .......... 10, 13, 14

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) .......... 13, 15

*PaineWebber Inc. v. Bybyk*,
81 F.3d 1193 (2d Cir. 1996) .......... 18

*Rodriguez v. Festival Fun Parks, LLC*,
763 F. Supp. 3d 336 (E.D.N.Y. 2025) .......... 14, 15

*Ruiz v. New Avon LLC*,
No. 18-CV-9033 (VSB), 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) .......... 12

*Sacchi v. Verizon Online LLC*,
No. 14-CV-423-RA, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015) .......... 11

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) .......... 9, 10

*Simeon v. Domino's Pizza LLC*,
No. 17CV5550RJDST, 2019 WL 7882143 (E.D.N.Y. Feb. 6, 2019) .......... 22

*Smith v. RPA Energy, Inc.*,
732 F. Supp. 3d 278 (S.D.N.Y. 2024) .......... 17

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) .......... 15, 19, 21

*Starke v. Gilt Groupe, Inc.*,
No. 13–cv–5497 (LLS), 2014 WL 1652225 .......... 16, 22

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) .......... 16

*Suski v. Marden-Kane, Inc.*,
No. 21-CV-04539-SK, 2022 WL 103541 (N.D. Cal. Jan. 11, 2022) .......... 12

*Valiente v. Nexgen Glob., LLC*,
No. 23-13308, 2025 WL 3140480 (11th Cir. Nov. 10, 2025) .......... 10, 13

*Wexler v. AT & T Corp.*,
211 F. Supp. 3d 500 (E.D.N.Y. 2016) .......... 20

*Whitt v. Prosper Funding LLC*,
No. 1:15-CV-136-GHW, 2015 WL 4254062 (S.D.N.Y. July 14, 2015) .......... 16

## INTRODUCTION

Defendants WW International, Inc., WW.Com, LLC, Weekend Health of Texas, PA, Weekend Health of New Jersey P.C., Weekend Health of Pennsylvania, P.C., and WeightWatchers Clinic f/k/a Brantley T. Jolly, M.D.'s ("Defendants" or "WW") Motion to Compel Individual Arbitration ("Motion" or "Mot.") (ECF No. 48-1) must be denied because indisputable facts show that Plaintiff Wachtl never, at any point, affirmatively agreed to arbitrate her claims against WW.[1]

WW's core argument is factually false. WW claims that it was "not possible" for Plaintiff Wachtl to sign up for a WW membership without "first checking a box to confirm [she] had read and agreed" to a "Membership Agreement" containing a "broad arbitration provision." Mot. at 1. The evidence shows the opposite. Screens reflecting the sign-up flow Plaintiff Wachtl used confirm that she was not required to check any box or take any other affirmative action to demonstrate she acknowledged or agreed to any Membership Agreement. This stands in sharp contrast to WW's current sign-up flow—which WW modified *after* filing this Motion—that *added* a checkbox and language stating that "[b]y checking [that] box, [the customer] agree[s] to be bound by these terms and [the] WeightWatchers Membership + Workshops Agreement." The sign-up flow Plaintiff Wachtl encountered did not require agreement to these terms.

The email receipt WW sent to Plaintiff Wachtl—which summarizes the details of her transaction and contains the terms governing her specific membership—further confirms Plaintiff Wachtl did not agree to arbitration. This is because the Membership Agreement hyperlinked in Plaintiff Wachtl's receipt does ***not*** contain an arbitration provision. Like the sign-up flow, WW only recently (after filing this Motion) updated the Membership Agreement that it sends to WW

[1] WW moved to compel Plaintiff Wachtl and Nancy Owen—2 of the 5 plaintiffs—to arbitration. Mot. at 1. Plaintiff Owen intends to voluntarily dismiss her claims in the near future. As a result, this Motion only concerns Plaintiff Wachtl.

customers like Plaintiff Wachtl to include an arbitration provision, well after Plaintiff Wachtl signed up for a WW membership and well after she filed this case. WW cannot avail itself of an arbitration provision it failed to include in the operative version of the contract it drafted.

WW's failure to obtain Plaintiff Wachtl's affirmative assent to any terms in the WW sign-up process, coupled with its affirmative act of personally sending Plaintiff Wachtl a membership confirmation with an operative Membership Agreement that lacked an arbitration provision, dooms WW's attempt to take away her right to proceed in federal court and force her to arbitration. But even if WW were right in claiming the Membership Agreement hyperlinked in the sign-up flow applied to Plaintiff Wachtl—and it is not—its Motion would still fail because Plaintiff Wachtl's and the Class's claims fall outside the scope of that agreement and do not in any way arise out of or relate to ***any*** Membership Agreement.

For these reasons, the Court should deny WW's Motion in its entirety.

## STATEMENT OF FACTS

### I. The WW Sign-Up Process as of December 31, 2024

Plaintiff Wachtl completed the WW Intro Questionnaire on the WW website on December 31, 2024. *See* Class Action Complaint ("Complaint"), ECF No. 1 ¶¶ 66-69; *see* Ex. A. This questionnaire spans several screens and asks a series of health questions, ranging from providing one's current weight to answering whether they have Type 1 or Type 2 diabetes. *See* Complaint ¶¶ 66-69. After completing this questionnaire, WW directed Plaintiff Wachtl to a separate page to enter her email address, and then a subsequent page to provide her first name, last name, and select a password. *See* Ex. B. How this screen appeared, as of December 31, 2024, when Plaintiff Wachtl signed up for a WW Core 10-month membership, is depicted below:

**FIGURE 1**




As shown above, there are only two checkboxes found on this screen. The first is next to the option to sign up to "receive emails from WW[,]" whereas the second is next to the box confirming the customer is "18 years or older, [is] not pregnant and [does] not have an active diagnosis of bulimia nervosa or anorexia nervosa." The sole reference to the Membership Agreement occurs in a sentence, a paragraph below the checkboxes, in a gray font much smaller than the text field boxes and next button. There is no checkbox next to this distant paragraph, and a customer could easily skip over it prior to selecting the blue "Next Step" button.

Notably, this screen is *different* than the sign-up screen depicted in Paragraph 7 of the Declaration of Edward Cai ("Cai Declaration"). ECF No. 48-3. That is because the sign-up screen in the Cai Declaration is not the actual sign-up flow that was available on December 31, 2024.

Rather, the screenshot depicted in that paragraph was taken by WW's counsel on a live version of WW's website at some later point in time.[2] *See* Ex. C 105:2-7 (A: ". . . the screenshot today versus the screenshot from December 31, 2024 is pretty much exactly the same, so it's hard for me to figure out if that screenshot is – which one was the one that I took."); *id*. at 105:8-11 (A: "so I think what this screenshot is, is a screenshot of – that my counsel took because it has their email[.]"); *id.* at 106:4-6 (Q: "Do you know what time this screenshot was taken?" A: "I don't know the time."). The differences between these screens are described in Section II.

After this step, the customer is then brought to yet another screen to "[r]eview and submit" their order. *See* Ex. B. On this page, WW presents users with additional terms, which are distinguished by bold and capitalized font. This section states "[b]y submitting payment you agree to: AUTOMATIC RENEWAL AND CANCELLATION." *Id.* The customer must enter their payment information and click the "Submit payment" button to obtain a WW membership. *Id.* There is no hyperlink or reference to the WW Membership Agreement found on this checkout page. *Id.*

[2] In preparing his declaration, Mr. Cai checked the "contents" of the screens but failed to check that the checkboxes were in the same spot on December 31, 2024. *See* Ex. C 106:12-25 (explaining Mr. Cai checked the "contents of the – the checkboxes" but did "not check if [the checkboxes] were [in] the same spot"); *id.* at 107:10-18 (explaining Mr. Cai compared the screens by "manually" checking them "[w]ith [his] eyes[.]"). That Mr. Cai failed to notice the differences in these screens makes sense, given that he admitted—"[t]o be honest" —that mostly all of the terms look the same to [him]." *Id*. at 111:13-16.

**FIGURE 2**




After completing this process, WW emails its customers a formal "WW receipt" confirming their transaction. *See* Ex. D. Plaintiff Wachtl received her receipt on December 31, 2024, the same day she signed up for a WW membership. *See id*. The email provided a formal "summary" of Plaintiff Wachtl's transaction and advised Plaintiff Wachtl to "reference the Membership Agreement." *See id*. The Membership Agreement hyperlinked in Plaintiff Wachtl's receipt did not contain any arbitration provision. *See* Ex. E. It also does not contain a choice of law clause. *Id.*

WW's records confirm that the only WW product Plaintiff Wachtl purchased was a Core – 10 Month plan on December 31, 2024. *See* Ex. A; *see also* Ex. C 70:21-24 (Mr. Cai confirming that Plaintiff Wachtl "only signed up for a core ten-month subscription").[3] This membership expired on October 31, 2025. *See* Ex. A; Ex. F 31:3-5 (Plaintiff Wachtl explaining she cancelled her membership "at the end of the subscription").

On January 7, 2025, Plaintiff Wachtl completed the questionnaire for WW's separate "Clinic" product (*see* Ex. G), which resulted in the disclosure of her health data to third parties like Meta and Google. *See* Complaint ¶¶ 51, 111-117. Plaintiff Wachtl did not, however, complete this "Clinic" sign-up flow (*see* Ex. H), and, accordingly, did not agree to any terms supposedly associated with purchase of that product. *See* Ex. C 182:12-19 (explaining there would be "a record of a – of a clinic subscription" if Plaintiff Wachtl had signed up for this service); *id.* at 183:12-15 (Mr. Cai testifying Plaintiff Wachtl "completed the clinic questionnaire but did not complete the checkout for clinic."); *id.* at 195:12-196:6 (explaining Plaintiff Wachtl would have reached the "you qualify" page of Exhibit H but did not "checkout and pay for Weight Watchers Clinic.").

## II. Subsequent Changes to the WW Sign-up Process Confirm Prior Inadequacy

At some point after Plaintiff Wachtl signed up for a WW membership, WW changed the sign-up process to add a third checkbox next to the term "You agree that WW may process health related data (e.g., weight history, diabetes) to the extent necessary for the provision of the tools and function of WW products (e.g., providing your food plan and Points Budget)." *See* Cai

---

[3] Mr. Cai's Declaration submitted in support of WW's Motion to Dismiss, as well as Plaintiffs' Complaint, suggests that Plaintiff Wachtl signed up for WW "Clinic" services. *See* ECF No. 49-2 ¶¶ 13-18; Complaint ¶ 48. That is incorrect. Mr. Cai's deposition confirmed that Wachtl did not complete the sign-up process for WW Clinic or any other service other than the 10-month Core plan. *See* Ex. C 144:23-145:7 (Q: "So with your correction here today, your representation is Plaintiff Wachtl did not sign up for Weight Watchers using the clinic questionnaire you describe in paragraph 13 through 17 of this declaration?" A: "Yes . . .").

Declaration ¶ 7; Ex. C 105:2-7 (confirming this screenshot was taken by WW's counsel using a live version of the website at some unidentified point in time). WW did not, however, add a checkbox next to the paragraph stating "[y]ou acknowledge you have read and agree to the Membership Agreement and Privacy Policy." *See* Cai Declaration ¶ 7.

WW changed the sign-up process again after December 14, 2025. *See* Ex. I. Now, there is only one provision on the page where customers enter their name and password—the provision relating to their age and whether they have bulimia or anorexia—next to a checkbox. *Id.* The other separate provisions that used to appear on this page were moved to the final checkout page. *Id.*

**FIGURE 3**




On the new final checkout page, there is now a checkbox next to the new language stating: "By checking this box, you agree to be bound by these terms and our WeightWatchers Membership

+ Workshops Agreement." *Id.* WW does not contend, and therefore concedes, that it did not require Plaintiff Wachtl to complete this new sign-up flow after her initial purchase. *Id.*

**FIGURE 4**




In addition to changing its website flow, WW also changed the terms of the Membership Agreement linked in the email receipt. According to Mr. Cai, WW had apparently "overlooked" that the Membership Agreement sent to each customer did not contain an arbitration provision. *See* Ex. C 114:1-25 (explaining "the engineering team, the marketing team, the QA team, the product team . . . all did [their] best" to "change[]" the terms but they had "overlooked" updating the version emailed to users); Ex. C 113:15-20 ("I am aware that in the email that Toni Wachtl received in her receipt – as her receipt, the URL link had not been updated for the most up-to-date terms."). Indeed, it did not realize its Membership Agreement did not contain an arbitration provision for ***ten months***, despite claiming how "important" these terms are and how many individuals at WW periodically review these terms. *See* Ex. C. 117:2-9 (admitting WW updated the Membership Agreement hyperlinked in each customer's receipt "after" Plaintiff Toni Wachtl signed up for a WW membership); Ex. C 126:15-21 ("[O]ur legal team will then review the terms again to make sure that the live terms are exactly what they said it should be. And then in addition to that, I

wouldn't be surprised if there's more people even that look at these terms since they're so important.").

After Plaintiffs highlighted this fatal defect in WW's Motion,[4] WW retroactively changed the content of the Membership Agreement emailed to each WW customer sometime after October 2025—well after Plaintiff Wachtl signed up for a WW membership and well after she had received her email receipt—to include an arbitration provision. *See* Ex. J. The new version of the Membership Agreement—which mirrors WW's Exhibit A (ECF No. 48-2)—states that it was "[l]ast updated" on "December 19, 2024" despite that these changes were made only recently.[5] *See* Ex. J.

**<u>CHOICE OF LAW</u>**

Plaintiffs do not concede that New York law applies here because, as described herein, WW never provided notice of or obtained assent to a version of the Membership Agreement containing a New York choice of law clause. *See* Section I; *see also Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."). However, it is unnecessary to resolve any choice of law issues now because the laws of the respective forums (i.e., New York, California, and Florida) do not vary in any material

---

[4] It was not until after Plaintiffs' counsel notified WW's counsel that the Membership Agreement emailed to Plaintiff Wachtl did not contain an arbitration provision on October 21, 2025 that WW changed the terms in the Membership Agreement. *See* Declaration of Amanda Fiorilla in Support of Plaintiffs' Opposition to Defendants' Motion ¶ 14.

[5] This is not the first time the "Last Updated" date of the WW Membership Agreement was inaccurate. For example, Exhibit A to WW's Motion (ECF No. 48-2) states that it was last updated in December 2024, despite that it was updated in August 2025. *See* Ex. C 129:5-11 (Mr. Cai acknowledging that his declaration states the "December 2024 version" is the operative version even though the operative version is actually from August 2025); *id.* at 134:16-135:6 (Mr. Cai explaining he does not "know what the QA process is for the content on the website in detail" and does not know if there is a process in place to ensure the last updated field is accurate).

way as they pertain to WW's Motion. *See Schnabel*, 697 F.3d at 119 (explaining the Court need not decide choice of law issues because the laws are "substantially similar" for purposes of "determining whether the parties have mutually assented to a contract term."); *see also Valiente v. Nexgen Glob., LLC*, No. 23-13308, 2025 WL 3140480, at *3 (11th Cir. Nov. 10, 2025) (declining to resolve choice of law issue because "California and Florida law point to the same outcome" on the issue of arbitration).

**LEGAL STANDARD**

There is no dispute that Plaintiff Wachtl did not have actual notice of any WW terms containing an arbitration provision. *See* Ex. F. at 22:20-24 (Plaintiff Wachtl testifying she does not remember seeing the WW Membership Agreement dated December 19, 2024). When an individual lacks actual notice, they can only be bound by terms "if [they are] on inquiry notice of them and assent[] to them through conduct that a reasonable person would understand to constitute assent." *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019), *aff'd,* 815 F. App'x 612 (2d Cir. 2020); *Valiente v. Nexgen Glob., LLC*, No. 23-13308, 2025 WL 3140480, at *6 (11th Cir. Nov. 10, 2025) (explaining enforcement hinges on whether terms were "conspicuous" and "mutual assent"); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (explaining inquiry notice requires "reasonably conspicuous notice of terms" and that "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms").

Separately, when an operative version of an agreement does not contain an arbitration provision, a party's motion to compel arbitration must fail regardless of whether a prior version contained a valid arbitration clause. *See Dasher v. RBC Bank (USA),* 745 F.3d 1111, 1122 (11th Cir. 2014) (agreeing with "Second and Sixth Circuits" and holding that sending a new agreement

that does not contain an arbitration provision "renders a prior agreement's arbitration clause ineffective.").

## ARGUMENT

### III. The Operative Membership Agreement Did Not Contain an Arbitration Provision

WW's motion fails because the Membership Agreement it confirmed Plaintiff Wachtl agreed to did ***not*** contain an arbitration provision. *See* Sections I-II; Ex. E. That Membership Agreement expressly states that any action "shall be filed only in the state or federal courts located in . . . the State of New York" and that "[i]n the event of any conflict" between WW's various terms and conditions, that "***this Agreement shall control.***" *See* Ex. E. (emphasis added).

Regardless of what terms WW claims were hyperlinked in the sign-up flow earlier on, these later terms became the operative Membership Agreement because WW sent them to Plaintiff Wachtl with her receipt to confirm that they governed this transaction. *See Bennett v. Barclays Bank Delaware,* No. 24 CIV. 6549, 2025 WL 2690390, at *3 (S.D.N.Y. Sept. 19, 2025) (enforcing terms that were personally sent to plaintiff with his new credit card); *Sacchi v. Verizon Online LLC*, No. 14-CV-423-RA, 2015 WL 765940, at *7 (S.D.N.Y. Feb. 23, 2015) (finding version of terms of service that were successfully emailed to plaintiff became the operative version of that agreement); *In re Checking Acct. Overdraft Litig.,* 915 F. Supp. 2d 1334, 1339 (S.D. Fla. 2013), *aff'd sub nom. Dasher v. RBC Bank (USA)*, 745 F.3d 1111 (11th Cir. 2014) (enforcing "new version" of terms that were sent to each customer); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1104 (C.D. Cal. 2002) (enforcing terms personally mailed to a consumer).

Because these terms lack an arbitration provision, WW cannot compel Plaintiff Wachtl to arbitration. *See Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011) (reversing district court decision compelling arbitration because "subsequent contract" did

not contain an arbitration clause and stated disputes would be "adjudicate[d]" by "specified courts[.]"); *Ruiz v. New Avon LLC*, No. 18-CV-9033 (VSB), 2019 WL 4601847, at *9 (S.D.N.Y. Sept. 22, 2019) (similar); *see also Suski v. Marden-Kane, Inc.,* No. 21-CV-04539-SK, 2022 WL 103541, at *6 (N.D. Cal. Jan. 11, 2022) *aff'd sub nom. Suski v. Coinbase, Inc.*, 55 F.4th 1227 (9th Cir. 2022), *aff'd*, 602 U.S. 143 (2024) (refusing to compel arbitration where subsequent terms did not contain an arbitration clause and, instead, stated disputes should be resolved by "California courts"); *Dasher*, 745 F.3d at 1122 (finding new terms lacking an arbitration provision "renders a prior agreement's arbitration clause ineffective"); *In re Checking Acct. Overdraft Litig.*, 915 F. Supp. 2d at 1339 (refusing to compel arbitration where the "new version of the account agreement" sent to each customer "did not contain an arbitration clause.") (citing cases).

While WW claims that leaving out an arbitration provision in the operative version of the Membership Agreement was a mistake (*see* Section II), unilateral mistakes (at best) make an agreement voidable but, even then, only where the mistake "concerns 'a basic assumption on which the contract was made.'" *See Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.,* 429 F. Supp. 2d 582, 599 (S.D.N.Y.), *supplemented*, 458 F. Supp. 2d 178 (S.D.N.Y. 2006). Because WW cannot meet that burden—given that Plaintiff Wachtl does not recall any membership agreement with an arbitration clause and certainly did not "assum[e]" one existed (Ex. F 22:20-24 (Plaintiff Wachtl stating she does "not remember seeing" the December 19, 2024 Membership Agreement during the "sign-up flow"))—the contract is not voidable, and WW remains bound by its own terms that it drafted.

**IV. WW Cannot Show Notice and Assent to the Non-Operative Hyperlinked Terms**

Even if WW had not sent Plaintiff Wachtl the operative Membership Agreement lacking any arbitration clause (which it concedes it did), its Motion would still fail because it did not

provide notice or obtain Plaintiff Wachtl's assent to the (non-operative) Membership Agreement hyperlinked in the sign-up flow. Internet agreements exist on a spectrum of enforceability. On one end are "clickwrap" agreements, i.e., sign-up flows that require a user to click a conspicuous "I agree" box "after being presented with . . . terms or conditions of use." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236 (2d Cir. 2016). On the opposite end of the spectrum are "browsewrap" agreements, which merely post terms via a hyperlink and, therefore, "do not request an express manifestation of assent." *Nicosia*, 834 F.3d at 233; *see also Berman*, 30 F.4th at 856 (9th Cir. 2022) (explaining similar distinction between clickwrap and browsewrap agreements); *Valiente v. Nexgen Glob., LLC*, No. 23-13308, 2025 WL 3140480, at *6 (11th Cir. Nov. 10, 2025) (same).

Falling between these two types of agreements are "hybridwrap" terms, i.e., terms that are presented through a hyperlink and require the user to "perform[]" some "action (such as creating the account or executing the purchase)[.]" *Nicosia*, 384 F. Supp. 3d at 266, *aff'd*, 815 F. App'x 612 (2d Cir. 2020).[6] As noted by the Second Circuit, "[c]ourts will give effect to hybrid wrap terms where the button required to perform the action manifesting assent . . . is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms." *Id.* "The more the hybrid wrap design diverges from this basic layout—such as by placing the notice further away from the action button. . . or omitting the language explicitly saying that by performing the action the user agrees to be bound by the terms—the less likely courts are to find that inquiry notice has been provided." *Id.*

Here, WW's sign-up flow as of December 31, 2024 categorically does not qualify as a

[6] The Ninth Circuit sometimes refers to these as "sign-in wrap" agreements. *See Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) ("[A] sign-in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms.").

"clickwrap" agreement because there was no checkbox for the user to click to affirmatively demonstrate their assent to the Membership Agreement. *See* Section I; *see also* Ex. B. WW's claim (Mot. at 7-8) that the checkbox asking customers to confirm they are 18 years or older and do not have a bulimia or anorexia ***also*** applies to the section having to do with its Membership Agreement should be rejected. These sections are both logically (i.e., having to do with entirely different subject matter) and physically (i.e., appearing in entirely distinct paragraphs) separate, such that a checkbox in one place cannot apply to the other. *See Rodriguez v. Festival Fun Parks, LLC*, 763 F. Supp. 3d 336, 354 (E.D.N.Y. 2025) (finding no notice or assent where "button" is not "directly adjacent" to the "presentation of the Terms").

Indeed, WW's own declarant, Mr. Edward Cai, thought this checkbox ***did not apply*** to the Membership Agreement, despite having personally viewed this process over 1,000 times. *See* Ex. C 100:4-16 (Q: "Do you see that there's no checkbox next to the sentence, 'you acknowledge you have read and agree to the Membership Agreement and Privacy Policy'" A: "I see there's no checkbox next to that. Oh, there is next to it. It's a – it's –it's, sort of like, one section with a checkbox next to it." A: "But it's in the separate paragraph from that other sentence, right?" A: "It is a separate paragraph."); *id*. 39:8-23 (Mr. Cai testifying that he has gone through the sign-up process "probably . . . a thousand times."). Further confirming that these provisions are separate is WW's current sign-up process, which left the section with the checkbox having to do with age, bulimia, and anorexia as is but moved the separate section having to do with WW Membership Agreement to an entirely separate page with a new checkbox next to that paragraph.

WW's sign-up process as of December 31, 2024 also is not an enforceable "hybrid wrap" agreement. Not only were the terms presented in a small font, but there was no language indicating what action, if any, by the customer would be treated as their assent to those terms making it

impossible for users to assent to those terms. *See Nicosia*, 384 F. Supp. 3d at 266, *aff'd*, 815 F. App'x 612 (2d Cir. 2020) (explaining where the design "omit[s] the language explicitly saying that by performing the action the user agrees to be bound by the terms—the less likely courts are to find . . . inquiry notice."); *see also Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1159 (9th Cir. 2025) (no assent where language stated "I agree to the Terms of Use and Privacy Policy" but the "action button" did not indicate "what action would constitute assent"); *Berman*, 30 F.4th at 857 ("A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement" (citing *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 28 (2d Cir. 2002); *Rodriguez*, 763 F. Supp. 3d at 355 (finding no assent where hyperlink "did not contain any text or visual signal that 'clearly warned' . . that clicking the 'Continue button' . . . 'would constitute assent'")).

The only button on the screen said "Next Step"—providing no indication that a user was agreeing to anything by clicking it. Users have to navigate to an entirely separate page, with separate terms to complete their transaction by clicking a different "submit payment" button on that page. *See Nicosia*, 834 F.3d at 236 (finding no assent where the terms "by placing your order, you agree to Amazon.com's privacy notice and conditions of use"—found in a small gray font with blue hyperlinks that was neither "bold" nor "capitalized"—was significantly far away from the button "Place your order"). Nor did that next page contain any "agreement" language. The only text near the "submit payment" button referred to WW's Cancellation Policy, stating "By submitting payment you agree to: AUTOMATIC RENEWAL AND CANCELLATION." There was no reference, at all, to the Membership Agreement or that by "submitting payment" customers would be bound by those separate terms. *See Rodriguez*, 763 F. Supp. 3d at 354 (finding no notice where the Terms & Conditions hyperlink is "visually separated from the portion of the webpage

that displays the total purchase price" and the "button . . . to move forward with a purchase" such that the "layout makes it unclear that the 'Terms & Conditions' hyperlink actually relates to the act of purchasing [the product]."); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 294 (2d Cir. 2019) (explaining that "[t]o provide conspicuous notice" the defendant "could have simply included a noticeable hyperlink on the . . . purchase page" rather than hyperlinking the terms in a way that was "spatially decoupled from the transaction"); *accord Berman*, 30 F.4th at 858 (close proximity of a hyperlink is not enough, and "the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement").

The lack of either a checkbox or any other feature requiring the user to "take[] some action" in agreement (Mot. at 6) defeats WW's attempt to show Plaintiff Wachtl had notice of, and assented to, the Membership Agreement linked in the WW membership sign-up flow. The cases WW cites confirm this, as they each—unlike here—clearly directed the user what action to take to show their notice of, and assent to, the terms. Mot. at 6 (citing *Lewis v. Samsung Elecs. Am., Inc.*, 2023 WL 7623670, at *6 (S.D.N.Y. Nov. 14, 2023) (clickwrap agreement where the hyperlink was found "directly adjacent" to the "button intended to manifest assent to the terms[.]"); *Whitt v. Prosper Funding LLC*, No. 1:15-CV-136-GHW, 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) (requiring the user to "click a box adjacent to the bolded text '**Clicking the box below constitutes your acceptance of** . . . the borrower registration agreement") (bold in original); *Starke v. Gilt Groupe, Inc.*, No. 13–cv–5497 (LLS), 2014 WL 1652225, at *2 (informing the user in the sign-up flow that by clicking the button "Shop Now" he was "agree[ing] to the Terms of Membership . . ."); *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08–cv–5463 (CM)(GWG), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) (requiring the user to select "I agree" to the terms of the license agreement); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023) (stating "I agree

to the payment terms . . . directly above" a "Confirm and continue" button, which [the] user must click to complete the purchase[.]")); *Brooks v. Yang*, 216 A.D.3d 505, 506 (1st Dep't 2023) (clickwrap agreement requiring the user to take "two separate actions" to indicate their assent); *Smith v. RPA Energy, Inc.*, 732 F. Supp. 3d 278, 286 (S.D.N.Y. 2024) (providing a clear "bright green" button to "preview your contract(s)" prior to signing them); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78-79 (2d Cir. 2017) (informing the user "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" that appeared "directly below the buttons for registration")). WW used none of these features or comparable language.

## V. The Scope of the Arbitration Provision Is Not an Issue for the Arbitrator

WW's argument that the scope of its arbitration provision must be determined by an arbitrator fails because, as described above, there is no valid arbitration provision at all. *See* Section III.

But even if WW's arbitration provision in the non-operative Membership Agreement applied, the threshold issue of the scope of arbitrability would still be a question for this Court. This is because the "law generally treats arbitrability as an issue for judicial determination" unless "the parties clearly and unmistakably provide otherwise." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014). Here, there is no clear delegation clause. *See* ECF No. 48-2 at 21. The provision at issue simply states that "[i]n the event of any dispute, claim, question, or disagreement arising from or relating ***to these Terms & Conditions*** . . . all disputes shall be resolved by binding arbitration[.]" *Id.* The threshold clause limiting disputes to only those arising out of and relating to the "Terms & Conditions" (i.e., the non-operative Membership Agreement) is categorically too narrow to encompass a dispute about the scope of the arbitration provision itself. *See Cape Flattery Ltd. v. Titan Mar., LLC,* 647 F.3d 914, 924 (9th Cir. 2011) (citing Second

Circuit precedent and finding that "an arbitration agreement covering" only disputes "'arising under' the agreement" only applies to those "relating to the interpretation and performance of the contract itself" and not the separate issue of whether a claim itself is arbitrable); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 320 (2d Cir. 2021) (explaining arbitration provision that has a "limited scope" creates "ambiguity as to whether the parties clearly and unmistakably intended to delegate the question of arbitrability to the arbitrator" such that it is an issue for the court to decide).

This self-imposed limitation distinguishes WW's arbitration provision in the non-operative Membership Agreement from the one at issue in *PaineWebber*, which—unlike WW's provision—included "any and all controversies" between the parties regardless of whether they arise out of the terms themselves or that specific transaction. *See* Mot. at 8-9 (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1196 (2d Cir. 1996) ("concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement[.]")).

WW's suggestion that incorporating the Commercial Arbitration Rules of the AAA saves its argument that scope was delegated to the arbitrator also fails. Mot. at 8-9 (citing *Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277, 283–84 (S.D.N.Y. 2015)). Unlike the incorporation of the AAA rules in *Lapina* (Mot. at 9), WW's provision expressly says that those rules only apply "subject to the limitations of [that] section[,]" which includes the provision limiting disputes to solely those arising out of or relating to WW's Terms & Conditions. *See NASDAQ OMX Grp., Inc.*, 770 F.3d at 1032 (rejecting similar argument because the "Services Agreement does not clearly and unmistakably direct that questions of arbitrability be decided by AAA rules; rather, it provides for AAA rules to apply to such arbitrations as may arise under the Agreement."); *Armor All/STP Prods. Co. v. TSI Prods., Inc.*, 337 F. Supp. 3d 156, 165 (D. Conn.

2018) (applying New York law and rejecting argument that incorporation of AAA rules meant the arbitrator should decide the question of arbitrability in light of similar "carve-out provision"). WW, as the drafter of its own terms, cannot insist on a broader interpretation than the plain language it chose to use.

## VI. Plaintiffs' Claims Do Not Fall Within the Scope of the Non-Applicable Arbitration Clause

Presuming for the sake of argument that WW's arbitration provision in the non-operative Membership Agreement is enforceable—and it is not—WW still cannot compel Plaintiff Wachtl's claims to arbitration because they fall outside the scope of the WW Membership Terms & Conditions. This is because, as described above, the arbitration provision is self-limiting and applies only to "dispute[s], claim[s], question[s], or disagreement[s] arising from or relating to [WW's Membership Agreement]." *See* ECF No. 48-2 at 21. Plaintiff Wachtl's claims, like all Class Members, have nothing to do with any WW membership; they arise out of WW's disclosure of their private health data while they interact with the WW ***website***. *See Specht*, 306 F.3d at 36 (explaining that in "determining whether a particular claim falls within the scope of the parties' arbitration agreement, [the] Court 'focus[es] on the factual allegations[']" and whether "those allegations 'touch matters' covered by the [arbitration agreement]").

Anyone can use the WW website regardless of membership. Thus, several members of the Class will have claims even though they ***never*** actually purchased a membership from WW and, accordingly, could not possibly be bound by any Membership Agreement. WW acknowledges this by maintaining a separate "Terms and Conditions of Use" for its general website, which it admits can be used by non-registered users. *See* Ex. K (stating these terms apply "to [customers'] use of the website . . . including, without limitation, [ww.com] and any other website that [WW] may own or operate currently or in the future[.]" ); *id.* ("***[customers] do not have to become a registered***

***user to use [WW's] Website***."). These terms do not contain an arbitration provision. *Id.*

Indeed, Plaintiff Wachtl herself has claims for completing the WW Clinic Questionnaire on the WW website in January 2025, which is a completely separate product from her 10-month core plan to which the Membership Agreement applies. *See* Section I. Plaintiff Wachtl had her health data disclosed to third parties, like Meta and Google, when she completed this questionnaire (¶¶ 51, 111-117), but she never actually completed the sign-up process for or purchased the WW Clinic service. *See* Ex. C 144:23-145:7 (Q: "So with your correction here today, your representation is Plaintiff Wachtl did not sign up for Weight Watchers using the clinic questionnaire you describe in paragraph 13 through 17 of this declaration?" A: "Yes . . .").

That Class Members, including Plaintiff Wachtl, have claims even though they did not actually sign up and pay for certain services confirms that these claims are entirely separate from any WW membership and its respective terms. *See Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 119 (2d Cir. 2025) (finding plaintiffs' claims fell outside Grubhub's terms because their claims "have nothing to do with" the "use of Grubhub[]" but plaintiffs' "access and use of *other* platforms and restaurants") (emphasis in original); *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 183 (2d Cir. 2021) (relying on Ninth Circuit precedent and finding arbitration provision in employee agreement did not cover claims relating to separate investment decisions); *FUJIFILM N. Am. Corp. v. Geleshmall Enters. LLC*, 239 F. Supp. 3d 640, 649 (E.D.N.Y. 2017) (finding "gray market claims" were not subject to arbitration because they "exist separate and apart from the conduct that is the subject of the 2014 Agreement."); *Wexler v. AT & T Corp.,* 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) (invalidating arbitration clause and explaining a reasonable consumer would not understand an arbitration provision in a cellular company's terms of service would include "every possible dispute" including those "unrelated to cell phone coverage"); *Microsoft Corp. v.*

*Samsung Elecs. Co.,* 60 F. Supp. 3d 525, 531 (S.D.N.Y. 2014) (finding claims fell outside the Royalty and Credit Calculation Reports and Annual Invoices even though the action would require "interpretation of substantive provisions of both agreements" because the "real controversy" did not concern "the discrete accounting and invoicing issues that the parties have agreed to arbitrate"); *see also Armor All/STP Prods. Co. v. TSI Prods., Inc.,* 337 F. Supp. 3d 156, 170 (D. Conn. 2018) (finding agreement to provide consulting services did not encompass separate claims for "intellectual property rights and unfair competition").

The Second Circuit's decision in *Specht*, 306 F.3d at 37 is particularly instructive on this point. There, plaintiffs downloaded the defendant's "Communicator" product, which was subject to the Communicator license agreement containing an arbitration provision. *Id.* at 38. The Second Circuit affirmed the District Court's decision finding that plaintiffs' privacy and eavesdropping claims fell outside this agreement because it was not the Communicator product that actually performed the eavesdropping, but a separate product offered by the defendant called "SmartDownload." *Id.* Notable to the Court was the fact that, like here, plaintiffs and class members could use the eavesdropping SmartDownload software "even if they are not installing or upgrading Communicator." *Id.* The same is true here—Plaintiff Wachtl and Class Members need not be WW members to have their private health data intercepted from the WW website—confirming their claims fall outside the scope of any membership agreement.

The cases WW relies on that have found employee disputes fall within broad arbitration provisions found in employee contracts are not comparable to Plaintiff Wachtl's claims here, which exist entirely independent of whether she ever purchased a membership from WW. *See* Mot. at 9-10 (citing *AT&T Technologies, Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 650 (1986) (finding employee labor disputes fell under an employment contract stating any "interpretation of

[the] contract or the performance of any obligation hereunder" shall be brought in arbitration); *Simeon v. Domino's Pizza LLC*, No. 17CV5550RJDST, 2019 WL 7882143, at *6 (E.D.N.Y. Feb. 6, 2019) (finding employment agreement stating it applies to "any claims related to wages [and] reimbursements" applied to employee's claims for "wage, reimbursement, and Wage Theft Notice claims.")). Its separate reliance on *Foster Wheeler Env't Corp. v. EnergX TN, LLC*, No. 13 CIV. 1178 RA, 2014 WL 982857, at *5 (S.D.N.Y. Mar. 13, 2014)—where the scope of the arbitration provision was not contested—equally has no relevance here.

**VII. The Class Action Waiver Is Equally Unenforceable**

WW's class action waiver is unenforceable for the same reasons described above, including because there is no class action waiver (or arbitration provision) in the operative version of the Membership Agreement (*see* Section III; *see also* Ex. E) and because the non-operative Membership Agreement WW argues should (but does not) apply cannot conceivably encompass Plaintiff Wachtl's and the Class's claims here. *See* Section VI. Neither *Mullo* nor *Starke* are comparable because, in both cases, there was a valid arbitration provision and class action waiver covering the claims at issue. *See* Mot. at 10-11 (citing *Mullo v. DoorDash, Inc*., No. 22-CV-2430 (VEC), 2023 WL 1971897, at *3 (S.D.N.Y. Jan. 17, 2023) (plaintiff "provided no grounds upon which the Court might invalidate" the arbitration provision and delegation clause); *Starke*, 2014 WL 1652225, at *4 (finding "assent" because plaintiff was informed when clicking "Shop Now" that he was "agree[ing] to the Terms of Membership for all Gilt Groupe sites.")). The same is not true here. *See* Sections III, VI.

**CONCLUSION**

WW's Motion should be denied in its entirety.

Dated: January 6, 2026

*_/s/ Amanda Fiorilla_*

Christian Levis
Amanda Fiorilla
Rachel Kesten
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

Vicki J. Maniatis (NY Bar No. 2578896)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel.: (516) 491-4665
vmaniatis@milberg.com

Gary M. Klinger (*pro hac vice*)
William J. Edelman (*pro hac vice*)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com
wedelman@milberg.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

As required by the United States District Court for the Southern District of New York Local Rule 7.1(c), I certify that the document contains 6,720 words, excluding the parts of the document that are exempted by the United States District Court for the Southern District of New York Local Rule 7.1(c). I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 6, 2026 *\/s/ Amanda Fiorilla*