**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERICA BRUCKNER, ANITA CAMPANA, MEGAN CONNOR, DONNA EDWINS, ALLISON GIORGIO, JANINE HENRY, ASHLEY RODRIGUEZ, SUSANNE STROM, JENNIFER TORRES, ANTOINETTE WACHTL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WW INTERNATIONAL, INC., WW.COM, LLC, WEEKEND HEALTH OF TEXAS, PA, WEEKEND HEALTH OF NEW JERSEY P.C., WEEKEND HEALTH OF PENNSYLVANIA, P.C., AND BRANTLEY T. JOLLY, M.D., PROF. CORP.,<br><br>Defendants. | Case No.: 1:25-cv-02944-RA-GWG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Erica Bruckner, Anita Campana, Megan Connor, Donna Edwins, Allison Giorgio, Janine Henry, Ashley Rodriguez, Susanne Strom, Jennifer Torres, and Antoinette Wachtl ("Plaintiffs") bring this Class Action Complaint ("Complaint") on behalf of themselves, and all others similarly situated (the "Class Members") against WW International, Inc., WW.com, LLC, Weekend Health of Texas, PA, Weekend Health of New Jersey P.C., Weekend Health of Pennsylvania, P.C., and Brantley T. Jolly, M.D., Prof. Corp. ("Weight Watchers"), which operate, control, and manage weight-management programs and weight-related telehealth services through its websites weightwatchers.com and joinsequence.com (the "WW Websites"). The allegations contained in this Complaint, which are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit on behalf of similarly situated individuals to address Weight Watchers' illegal and widespread practice of disclosing its users' private data, including personally identifiable information ("PII") and health information, to unauthorized third parties, including at least Meta Platforms, Inc. ("Facebook" or "Meta"), Google LLC ("Google"), and Amplitude, Inc. ("Amplitude"), New Relic, Inc. ("New Relic"), Braze, Inc. ("Braze"), Peaberry Software Inc. d/b/a Customer.io ("Customer.io"), and Nextdoor, Inc. ("Nextdoor").

2. This occurred and continues to occur because of the tracking technologies Weight Watchers installed on the WW Websites it made available to its users, including but not limited to the Facebook Pixel, Google Analytics, Google Ads, Amplitude Analytics, as well as tracking software from New Relic, Braze, Customer.io, and Nextdoor (collectively, "Tracking Technologies").[1]

3. The Tracking Technologies Weight Watchers installed and configured on the WW Websites allow unauthorized third parties to intercept the contents of users' communications, receive and view users' private information, and use it for their own purposes, including in connection with lucrative ad services.

4. Weight Watchers owns and controls the WW Websites, which it encouraged Plaintiffs and other users to use for: (1) taking health-related questionnaires; (2) purchasing and getting access to its weight management programs; (3) obtaining information about the weight management programs; (4) booking appointments with Weight Watchers' clinicians or dietitians;

[1] This Complaint contains images and evidence demonstrating various Tracking Technologies were still used on the WW Websites as of the filing of this Complaint, but Plaintiffs do not know every tracking and/or marketing tool that was previously installed on the WW Websites during the relevant period, including when Plaintiffs first began using the WW Websites. These additional facts will be revealed during discovery.

(5) enrolling in and managing such telehealth services; (6) communicating with their telehealth care team; (7) obtaining weight-loss medications; and (8) making payments.

5. Weight Watchers knowingly and intentionally designed the WW Websites to solicit communications of private data from its users when they used the WW Websites, including when they obtain and receive weight-management and telehealth services from Weight Watchers.

6. Plaintiffs and other Class Members who used the WW Websites reasonably believed they were communicating only with Weight Watchers, and nothing about the WW Websites' appearance indicated that unauthorized third parties could intercept and obtain private and health-related information submitted by users.

7. Unbeknownst to Plaintiffs and Class Members, however, the WW Websites contained Tracking Technologies within their source code that surreptitiously track and transmit Plaintiffs' and Class Members' private online activity and communications (including health-related information) to third parties without their consent, in violation of numerous laws, industry standards, and user expectations.

8. For example, when a Weight Watchers user completes the questionnaire on the WW Websites to enroll in its telehealth services (the "Clinic Questionnaire") (available at: www.weightwatchers.com/us/personalassessment/clinical), each of the responses to these health-based questions are intercepted and used by third parties. This includes when a user answers, "Are you taking any of the following medications?" where the user would select "Insulin," "Sulfonylurea," "Meglitinide," "Opioid pain medication," "Psychiatric medication," or "None of these." In that instance, the question and corresponding answers are disclosed to, and used by, these third parties.

9. By installing the Tracking Technologies on the WW Websites, Weight Watchers effectively planted a bug on Plaintiffs' and Class Members' web browsers and devices that caused their communications to be intercepted, accessed, viewed, and captured by third parties in real time, as they were communicated by users, based on Weight Watchers' chosen parameters.

10. The information Weight Watchers divulged to unauthorized third parties is highly sensitive, which includes private health data such as specific responses to sensitive health questionnaires, as well as other related sensitive information (like PII) that users expect to remain private. Worse, this information was not aggregated or deidentified nor were the third parties prohibited from using this information for their own benefit. Indeed, many of these unauthorized third parties used this information for their own purposes, including to allow Weight Watchers to perform analytics and create targeted advertising campaigns on their platforms based on such data.

11. Consequently, Plaintiffs bring this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Weight Watchers from making similar disclosure of its users' private and health-related information in the future, and to fully articulate, *inter alia*, the specific private and health-related information it disclosed to third parties and to identify the recipients of that information.

12. As a result of Weight Watchers' conduct, Plaintiffs and Class Members have suffered numerous injuries, including invasion of privacy, loss of benefit of the bargain, diminution of value of the private and health-related information, statutory damages, and the continued and ongoing risk to their private and health-related information.

13. Plaintiffs seek to remedy these harms and brings causes of action for (1) violations of New York General Business Law § 349 ("GBL § 349"), *et seq*.; (2) violations of the Electronic

Communications Privacy Act ("ECPA"); (3) violation of Cal. Penal Code § 631 ("CIPA"); (4) intrusion upon seclusion; and (5) unjust enrichment.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different State than Weight Watcher.

15. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

16. This Court has personal jurisdiction over Weight Watchers because Weight Watchers has sufficient minimum contacts within this District. Weight Watchers is headquartered at 675 Avenue of the Americas New York, New York, which is in this District, and it provided weight management programs and weight-related telehealth services to users in this District.

17. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. More specifically, Weight Watchers is headquartered in this District, incorporated the Tracking Technologies in this District, and received and disclosed Plaintiffs' private and health-related information through these Tracking Technologies in this District.

## THE PARTIES

18. Plaintiff **Erica Bruckner** is a resident of California.

19. Plaintiff Bruckner became a Weight Watchers member in approximately March 2020. As a member, Plaintiff Bruckner has paid money to Weight Watchers in exchange for services.

20. In approximately April of 2024, Plaintiff Bruckner used the WW Websites to register for Weight Watchers' telehealth services. As a prerequisite for enrolling in Weight Watchers' telehealth services, Plaintiff Bruckner completed the clinic questionnaire ("Clinic Questionnaire") and communicated private information when completing this questionnaire.

21. Plaintiff Bruckner provided responses to each question in the Clinic Questionnaire, as further described in paragraphs 106-108 below, which include sensitive health information and other private data.

22. At the time Plaintiff Bruckner completed the Clinic Questionnaire, she maintained active Facebook, Instagram, and Google accounts. Plaintiff Bruckner used the same device that she used to access the WW Websites to access these accounts.

23. Unbeknownst to Plaintiff Bruckner, Weight Watchers disclosed her private communications, on the WW Websites, including on the Clinic Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Bruckner's answers to the Clinic Questionnaire, which revealed her past medication history, past diagnosis history, and past suicide attempts, family medical history, and alcohol usage, if any.

24. Plaintiff Bruckner did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

25. Plaintiff **Anita Campana** is a resident of Florida.

26. Plaintiff Campana has been a Weight Watchers member since approximately August 2019. As a member, Plaintiff Campana has paid money to Weight Watchers in exchange for services.

27. In January 2025, Plaintiff Campana used the WW Websites to register for Weight Watchers' telehealth services. As a prerequisite for enrolling in Weight Watchers' telehealth services, Plaintiff Campana completed the Clinic Questionnaire and communicated private information when completing this questionnaire.

28. Plaintiff Campana provided responses to each question in the Clinic Questionnaire, as further described in paragraphs 106-108 below, which include sensitive health information and other private data.

29. At the time Plaintiff Campana completed the Clinic Questionnaire, she maintained active Facebook, Instagram, and LinkedIn accounts. Plaintiff Campana used the same device that she used to access the WW Websites to access these accounts.

30. Unbeknownst to Plaintiff Campana, Weight Watchers disclosed her private communications, on the WW Websites, including on the Clinic Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Campana's answers to the Clinic Questionnaire, which revealed her past medication history, past diagnosis history, and past suicide attempts, family medical history, and alcohol usage, if any.

31. Plaintiff Campana did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

32. Plaintiff **Megan Connor** is a resident of Florida.

33. Plaintiff Connor has been a Weight Watchers member since approximately August 2019. As a member, Plaintiff Connor has paid money to Weight Watchers in exchange for services.

34. In approximately December of 2023, Plaintiff Connor used the WW Websites to register for Weight Watchers' telehealth services. As a prerequisite for enrolling in Weight

Watchers' telehealth services, Plaintiff Connor completed the Clinic Questionnaire and communicated private information when completing this questionnaire.

35. Plaintiff Connor provided responses to each question in the Clinic Questionnaire, as further described in paragraphs 106-108 below, which include sensitive health information and other private data.

36. At the time Plaintiff Connor completed the Clinic Questionnaire, she maintained active Facebook, Instagram, Google, and LinkedIn accounts. Plaintiff Connor used the same device that she used to access the WW Websites to access these accounts.

37. Unbeknownst to Plaintiff Connor, Weight Watchers disclosed her private communications, on the WW Websites, including on the Clinic Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Connor's answers to the Clinic Questionnaire, which revealed her protected health information, including but not limited to her medication history and family health history.

38. Plaintiff Connor did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

39. Plaintiff **Donna Edwins** is a resident of California.

40. Plaintiff Edwins was a Weight Watchers member, on and off, from approximately July 2019 to August 2025. As a member, Plaintiff Edwins has paid money to Weight Watchers in exchange for services.

41. In July 2019, Plaintiff Edwins used the WW Websites to register for Weight Watchers' weight-management membership program. In the process of doing so, Plaintiff Edwins completed the initial online questionnaire on the WW Websites to determine which membership

was the best fit for her (the "Intro Questionnaire"), and communicated private information when completing this questionnaire. Plaintiff Edwins communicated this information each time she reactivated her Weight Watchers membership between 2019 to 2025.

42. Plaintiff Edwins provided responses to each question in the Intro Questionnaire, as further described in paragraphs 101-103 below, which include sensitive health information and other private data.

43. At the time Plaintiff Edwins completed the Intro Questionnaire, she maintained active Facebook, Instagram, and Google accounts. Plaintiff Edwins used the same device she used to access the WW Websites to access these accounts.

44. Unbeknownst to Plaintiff Edwins, Weight Watchers disclosed her private communications on the WW Websites, including on the Intro Questionnaire and at other times over the course of her membership, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Edwins's answers to the Intro Questionnaire which revealed her gender, weight, and height information, her weight loss goals, the reason why she cannot lose weight previously, whether she had diabetes, and the types of diabetes she had, if any.

45. Plaintiff **Allison Giorgio** is a resident of Florida.

46. Plaintiff Giorgio has been a Weight Watchers member since approximately February 8, 2024. As a member, Plaintiff Giorgio has paid money to Weight Watchers in exchange for services.

47. In February 2024, Plaintiff Giorgio used the WW Websites to register for Weight Watchers' weight-management membership program. In the process of doing so, Plaintiff Giorgio completed the initial online questionnaire on the WW Websites to determine which membership

was the best fit for her (the "Intro Questionnaire"), and communicated private information when completing this questionnaire.

48. Plaintiff Giorgio provided responses to each question in the Intro Questionnaire, as further described in paragraphs 101-103 below, which include sensitive health information and other private data.

49. At the time Plaintiff Giorgio completed the Intro Questionnaire, she maintained active Facebook, Instagram, and Google accounts. Plaintiff Giorgio used the same device she used to access the WW Websites to access these accounts.

50. Unbeknownst to Plaintiff Giorgio, Weight Watchers disclosed her private communications on the WW Websites, including on the Intro Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Giorgio's answers to the Intro Questionnaire which revealed her gender, weight, and height information, her weight loss goals, the reason why she cannot lose weight previously, whether she had diabetes, and the types of diabetes she had, if any.

51. Plaintiff Giorgio did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

52. Plaintiff **Janine Henry** is a resident of California.

53. Plaintiff Henry has been a Weight Watchers member since January 2023. As a member, Plaintiff Henry has paid money to Weight Watchers in exchange for services.

54. In January 2023, Plaintiff Henry completed the Intro Questionnaire on the WW Websites to determine which membership was the best fit for her, and, as a prerequisite for enrolling in Weight Watchers' telehealth services, Plaintiff Henry also completed the Clinic

Questionnaire, but ultimately did not become a WW Clinic user. In both instances, Plaintiff Henry communicated private information when completing the questionnaires.

55. Plaintiff Henry provided responses to each question in the Intro Questionnaire and Clinic Questionnaire, as further described in paragraphs 101-103 and 106-108 below, which included sensitive health information and other private data.

56. At the time Plaintiff Henry completed the Intro Questionnaire and Clinic Questionnaire, she maintained active Facebook, Instagram, and Google accounts. Plaintiff Henry used the same devices she used to access the WW Websites to access these accounts.

57. Unbeknownst to Plaintiff Henry, Weight Watchers disclosed her private communications on the WW Websites, including on the Intro Questionnaire and Clinic Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Henry's answers to the Intro Questionnaire and Clinic Questionnaire, which revealed her gender, weight, and height information, her weight loss goals, the reason why she cannot lose weight previously, whether she had diabetes, and the types of diabetes she had, if any.

58. Plaintiff Henry did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

59. Plaintiff **Ashley Rodriguez** is a resident of Florida.

60. Plaintiff Rodriguez was a Weight Watchers member from November 2023 to January 2024. As a member, Plaintiff Rodriguez has paid money to Weight Watchers in exchange for services.

61. In November 2023, Plaintiff Rodriguez used the WW Websites to register for Weight Watchers' weight-management membership program. In the process of doing so, Plaintiff Rodriguez completed the Intro Questionnaire and communicated private information when completing this questionnaire.

62. Plaintiff Rodriguez provided responses to each question on the online membership forms, as further described in paragraphs 101-103 below, which included sensitive health information and other private data.

63. At the time Plaintiff Rodriguez completed the Intro Questionnaire, she maintained active Facebook, Instagram, and Google accounts. Plaintiff Rodriguez used the same device she used to access the WW Websites to access these accounts.

64. Unbeknownst to Plaintiff Rodriguez, Weight Watchers disclosed her private communications on the WW Websites, including on the Intro Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Rodriguez' answers to the Intro Questionnaire which revealed her gender, weight, and height information, her weight loss goals, the reason why she cannot lose weight previously, whether she had diabetes, and the types of diabetes she had, if any.

65. Plaintiff Rodriguez did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

66. Plaintiff **Susan Strom** is a resident of California.

67. Plaintiff Strom has been a Weight Watchers member since approximately February 2011. As a member, Plaintiff Strom has paid money to Weight Watchers in exchange for services.

68. In February 2011, Plaintiff Strom used the WW Websites to register for Weight Watchers' weight-management membership program. In the process of doing so, Plaintiff Strom completed a questionnaire on the WW Websites and communicated private information when completing this questionnaire.

69. Since 2011, Plaintiff Strom has routinely communicated private information to Weight Watchers via the WW Websites and mobile app.

70. Plaintiff Strom has maintained active Facebook, Instagram, and Google accounts throughout this time period. Plaintiff Strom used the same device she used to access the WW Websites to access these accounts.

71. Unbeknownst to Plaintiff Strom, Weight Watchers disclosed her private communications on the WW Websites, including during her registration and at other times over the course of her 15 year membership, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Strom's answers to questions and other communications that revealed her gender, weight, and height information, her weight loss goals, the reason why she cannot lose weight previously, whether she had diabetes, and the types of diabetes she had, if any.

72. Plaintiff Strom did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

73. Plaintiff **Jennifer Torres** is a resident of Florida.

74. Plaintiff Torres was a Weight Watchers member from approximately January 2024 to January 2025. As a member, Plaintiff Torres has paid money to Weight Watchers in exchange for services.

75. In January 2024, Plaintiff Torres used the WW Websites to register for Weight Watchers' weight-management membership program. In the process of doing so, Plaintiff Torres completed the Intro Questionnaire and communicated private information when completing this questionnaire.

76. Plaintiff Torres provided responses to each question in the online membership forms, as further described in paragraphs 101-103 below, which include sensitive health information and other private data.

77. At the time Plaintiff Torres completed the Intro Questionnaire, she maintained active Facebook, Instagram, and Google accounts. Plaintiff Torres used the same device she used to access the WW Websites to access these accounts.

78. Unbeknownst to Plaintiff Torres, Weight Watchers disclosed her private communications on the WW Websites, including on the Intro Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Torres's answers to the Intro Questionnaire which revealed her gender, weight, and height information, her weight loss goals, the reason why she cannot lose weight previously, whether she had diabetes, and the types of diabetes she had, if any.

79. Plaintiff Torres did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

80. Plaintiff **Antoinette Wachtl** is a resident of Florida.

81. Plaintiff Wachtl has been a Weight Watchers member since approximately December 2024. As a member, Plaintiff Wachtl has paid money to Weight Watchers in exchange for services.

82. In December 2024, Plaintiff Wachtl completed the Intro Questionnaire, and she also completed the Clinic questionnaire but ultimately did not become a WW Clinic user. In both instances, Plaintiff Wachtl communicated private information when completing the questionnaires.

83. Plaintiff Wachtl provided responses to each question in the Intro Questionnaire and Clinic Questionnaire, as further described in paragraphs 101-103 and 106-108 below, which include sensitive health information and other private data.

84. At the time Plaintiff Wachtl completed the Intro Questionnaire and Clinic Questionnaire, she maintained active Facebook, Instagram, and Google accounts. Plaintiff Wachtl used the same device she used to access the WW Websites to access these accounts.

85. Unbeknownst to Plaintiff Wachtl, Weight Watchers disclosed her private communications, on the WW Websites, including on the Intro Questionnaire and Clinic Questionnaire, to unauthorized third parties such as Google, Meta, and Amplitude. This unauthorized disclosure included Plaintiff Wachtl's answers to the Intro and Clinic Questionnaire which revealed: (1) her gender, weight, and height information, her weight loss goals, the reason why she cannot lose weight previously, whether she had diabetes, and the types of diabetes she had, if any; and (2) her past medication history, past diagnosis history, past suicide attempts, family medical history, and alcohol usage, if any.

86. Plaintiff Wachtl did not consent to the disclosure and interception of her communications on the WW Websites, which was never disclosed and directly contrary to the representations made by Weight Watchers.

87. **Weight Watchers** is headquartered in New York and operates not only the WW Websites but also hundreds of studios across 49 states. Weight Watchers is a platform that provides

weight-management programs and weight-related telehealth services to users through the WW Websites.

88. Weight Watchers knowingly and intentionally incorporated Tracking Technologies on the WW Websites for the purpose of disclosing its users' private communications to third parties, including Meta, Google, and Amplitude, in order to obtain analytics and advertising services that advance its business interests.

89. As the owner and operator of the WW Websites, Weight Watchers had complete control over the technology it incorporated, and whether it used third parties' Tracking Technologies.

90. Weight Watchers knew at the time it incorporated the Tracking Technologies on the WW Websites that they would result in the disclosure of users' private communications to third parties by virtue of the Tracking Technologies' purpose, how they function, and the analytics and advertising services Weight Watchers received as a result.

91. For instance, Google provides website owners that use its Tracking Technology (like Weight Watchers) with access to the data collected from their users and provides them with tools and analytics to leverage that information to reach these individuals through Google Ads. Meta provides similar tools and analytics that allow website owners that use their respective tracking technology to access the data collected from their users and leverage it for advertising purposes. Weight Watchers knew, from these analytics, precisely what type of data it was allowing to be intercepted through these technologies it incorporated on the WW Websites.

92. Even without this, Weight Watchers must have known these Tracking Technologies would cause the disclosure of users' private communications, given repeated warnings by the Federal Trade Commission (FTC), Office for Civil Rights (OCR), and other

federal agencies and regulatory bodies against incorporating this type of technology on health-related webpages, like those offered by Weight Watchers.

93. For example, OCR has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies, such as the ones at issue here.[2] The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of health data to tracking technology vendors or any other violations of the HIPAA Rules." In other words, OCR has expressly stated that Weight Watchers' implementation of Tracking Technologies violates HIPAA Rules.

94. The FTC and OCR also provided additional "notice" in July of 2023 about the risk of using this technology, including specifically Google Analytics and the Meta/Facebook Pixel, because they can result in the "unauthorized disclosure of an individual's personal health information to third parties."[3]

95. Weight Watchers itself was aware that incorporating these types of tracking technologies could violate the law. In November 2022, Weight Watchers was sued in the Central District of California under the Video Privacy Protect Act for its incorporation of Meta Pixel that allowed Meta to track users' video viewing activities on its websites.[4] A lawsuit such as this would

---

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Jan. 9, 2025).

[3] Press Release, FED. TRADE COMM'N, FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies (Jul. 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

[4] *See Jesse Cantu v. WW.com, LLC*, No. 2:22-cv-07977 (C.D. Cal. 2022).

have prompted any diligent entity to review the incorporation of any tracking technology on its websites. However, Weight Watchers has made the choice to ignore this warning call and keep the Tracking Technologies incorporated on the WW Websites.

96. Despite this, Weight Watchers continued to disclose its users' private communications through its incorporation of these types of Tracking Technologies on the WW Websites. As such, Weight Watchers' conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class Members.

## FACTUAL ALLEGATIONS

### A. The WW Websites

97. Founded in 1963, Weight Watchers is a company that offers weight management programs and weight-related telehealth services. Weight Watchers encouraged users to use the WW Website for (1) taking health-related questionnaires; (2) purchasing and getting access to its weight management programs; (3) obtaining information about the weight management programs; (4) booking appointments with Weight Watchers' clinicians or dietitians; (5) enrolling in and managing such telehealth services; (6) communicating with their telehealth care team; (7) obtaining weight-loss medications; and (8) making payments.

98. Weight Watchers provide its weight management programs through its hundreds of studios across the nation, as well as virtual workshops available for users to book on the WW Websites. Weight Watchers also allow users to book appointments with clinicians, find in person and virtual meetings, and obtain prescription drugs, among other things.

99. In order to use any of Weight Watchers' services, users must provide their first and last name and email address and create an account with Weight Watchers. During account creation,

Weight Watchers requires users to check a box and confirm that they are 18 years or older, not pregnant, and do not have an active diagnosis of bulimia nervosa or anorexia nervosa.

100. Weight Watchers encourages users to take a Questionnaire (the "Intro Questionnaire") on the WW Websites to determine which programs and/or services are best fit for the user (Figure 1).

**FIGURE 1**




101. The Intro Questionnaire asks users to provide PII, such as age range and gender, as well as responses to a series of private and/or health-related questions, including gender, height, and weight information, goals for losing weight, the reason why they cannot lose weight previously, whether they had diabetes, and the types of diabetes they had (Figures 2-6).

**FIGURE 2**




**FIGURE 3**




**FIGURE 4**


Goals
What are your goals for losing weight?
To have more energy and stamina
To feel good in my body
To improve my overall health
To learn healthy, sustainable habits
To reduce stress and improve mental health
To be there for my family

**FIGURE 5**


Goals
What's kept you from achieving your weight-loss goals in the past?
Stress or boredom eating
Lack of support
Overly restrictive dieting
Not knowing what to eat or how much
The process is too overwhelming
Not enough time

**FIGURE 6**




102. After users complete the Intro Questionnaire, Weight Watchers provides an estimate of how long it would take to reach users' goal weight and makes a recommendation on which program they should purchase (Figure 7).

**FIGURE 7**



103. Weight Watchers then prompts the users to select and purchase the recommended program with 12-month, 6-month, and 1-month options. Users can also opt to purchase other programs.

104. After users have purchased a program, Weight Watchers prompt them to download its mobile application to keep track of the users' diet with a "Points Budget" and to access dietary and weight loss information there. Weight Watchers users can also schedule weight management workshops with coaches on the WW Websites or on its mobile application.

105. Separately, Weight Watchers users can pay additional fees to enroll in its telehealth services called Weight Watchers Clinic. Users who sign up for Weight Watchers Clinic can make appointments with Weight Watchers' clinicians or dietitians, arrange consultations with them, and obtain prescription drugs from them.

106. Those who wish to enroll in the Weight Watchers Clinic must complete the Clinic Questionnaire before they can purchase this program.

107. The Clinic Questionnaire also asks for PII such as name, gender, and date of birth, and it presents a list of questions that involve even more sensitive health information than the Intro Questionnaire. This includes:

- Whether the user used any weight loss medication within the past 3 months, including Wegovy, Mounjaro, Saxenda, Contrave, Phentermine, or Qsymia;
- Whether the user has ever been diagnosed with Type 1 diabetes, Type 2 diabetes, Prediabetes, Seizures, Pancreatitis, Glaucoma, Gastroparesis, Gallbladder disease, Sleep apnea, Low HDL-C, High triglycerides, High blood pressure, Heart disease, Osteoarthritis, Polycystic ovarian syndrome (PCOS), Non-alcoholic fatty liver

disease (NAFLD), Low testosterone, Asthma, Stroke, or Peripheral vascular disease;

- Whether the user has been diagnosed with bulimia nervosa or anorexia nervosa in the last year;
- Whether the user has a history of suicide attempts;
- Whether the user's parents or siblings have a history of Medullary thyroid cancer or Multiple endocrine neoplasia type 2;
- Whether the user is currently taking Insulin, Sulfonylurea, Meglitinide, Opioid pain medication, or Psychiatric medication;
- The amount of alcohol the user consumes per week;
- The user's last blood pressure reading; and
- The user's resting heart rate.

108. Once the user completes the Clinic Questionnaire, Weight Watchers makes a recommendation on whether or not the Weight Watchers Clinic services are suitable for the user and whether the user is allowed to enroll in the program.

109. After users have purchased and enrolled in Weight Watchers Clinic, they can access their services, communicate with their care coordinator directly, schedule appointments with clinicians and dietitians, and obtain weight-related prescription drugs.

110. In order for an enrolled-user to schedule appointments with clinicians and obtain prescriptions drugs, users need to complete yet another questionnaire (the "Consultation Questionnaire"), where the users verify their identities and provide health and medical information including:

- How often the user has been bothered by depressed feelings in the past two weeks;

- Whether the user ever had weight loss surgery;
- Whether the user ever took weight loss medications including Qsymia, Contrave, Phenetermine, Topiramate, Bupropion, Naltrexone, Metformin, or compounded medications;
- Whether and what GLP-1 medications the user has taken;
- Whether the user made him/herself vomit in the past six months to avoid gaining weight;
- Whether the user took more than recommended dosage of a medication in the past six months to lose weight;
- Whether the user excessively fast or exercise in the past six months due to concerns over weight;
- The user's blood pressure reading; and
- Whether the user has a history of kidney disease or renal failure or dysfunction, congestive cardiac failure, acute or chronic metabolic acidosis, hypersensitivity to Metformin.

111. After the user completes the Consultation Questionnaire, the user can then schedule a meeting with a clinician and obtain prescription for medications.

**B. The Tracking Technologies at Issue**

112. Weight Watchers incorporated Tracking Technologies from various third parties, typically in the form of snippets of code that surreptitiously intercept a users' online activity on the webpage that incorporates the Tracking Technologies. These third parties include, at least, Meta, Google, Amplitude, New Relic, Braze, Customer.io, and Nextdoor. Some of these Tracking

Technologies are offered by the largest advertisers in the world, who use the intercepted information to improve their ability to target and profile end users.

**i. Meta's Business Tools and the Pixel**

113. Meta operates the world's largest social media company and generated $134.9 billion in revenue in 2023, roughly 97.8% of which was derived from advertising.[5] Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.

114. In conjunction with its advertising business, Meta encourages and promotes entities and website owners, such as Weight Watchers, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

115. One of such Business Tools is Meta Pixel. Meta touted Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."

116. The Meta Pixel "tracks the people and type of actions they take."[6] When a user accesses a webpage hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Meta's servers.

---

[5] *Meta Reports Fourth Quarter and Full Year 2023 Results*, META, https://investor.atmeta.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx (last visited Jan. 14, 2025).

[6] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting. (last visited Jan. 14, 2025).

117. Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. Meta also receives "events" that are custom programmed by the website owner, which can reveal even more information about the website user and their specific interactions.

118. The information Meta receives via the Meta Pixel includes identifying information that can, by itself, identify a user, such as devices identifiers, IP address, and first and third-party cookies. Meta also goes through great lengths to further identify the user after its received. For instance, Meta uses "[a]dvanced" matching techniques to link the data received via the Meta Pixel to known Facebook users and also analyzes information entered in online forms to uncover further PII about the user, such as their email address.

119. Once the data is received and processed, Meta stores the data on its own servers. Meta then provides the website owner with analytics about the data (e.g., which users took certain actions on any given webpage, how many, etc.), which can be accessed through the website owner's Facebook Ads Manager account, as well as through the Facebook Events Manager. The website owner can also use the data for advertising through Meta. For instance, Meta encourages website owners to create "custom audiences" of users who have taken the same or similar actions on the website based on the data received through the Meta Pixel. Once a custom audience is created, Meta can target the audience directly, as well as uses the audience to "identify other Facebook users" similar to them and "target [those similar users] with [the website owner's] ads."

120. Meta also uses the data it receives through the Meta Pixel to fuel its own advertising business. Meta's own public documents confirm that Meta feeds the data received through the Meta Pixel in "machine learning models" that "consider that person's behavior" to predict who is likely to respond to any given ad, making its advertising services even more lucrative. These

machine learning models "learn[]" more as it "receives new data." Thus, each person whose data Meta receives through the Meta Pixel directly contributes to how successful Meta is at targeted advertising and contributes to Meta's behemoth of ad revenue.

121. Meta has no way to limit or prohibit the use of data collected through Meta Pixel given Meta's open systems and advanced algorithms. According to leaked internal Meta documents, one employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'" Stated differently, Meta intentionally designed its systems so that it can maximize the utility of all data it receives, including through the Meta Pixel.

**ii. Google Ads and Google Analytics**

122. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

123. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[7] Indeed in 2023, Google generated $237.8 billion in advertising revenue, which amounted to more than 77 percent of Google's total revenues for the year.

124. Google offers various tracking technologies, including the Google Analytics, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google

[7] Alphabet Inc. SEC Form 10-K for fiscal year ended December 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google Analytics also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

125. Google Analytics allows a customer to embed a small piece of code on the customer's website. This code immediately intercepts a user's interaction with the website or app every time the user visits or uses it, including what pages they visit, what they click on.

126. The code also collects identifiable information, such as the IP address and Client ID. Even if a user is not signed into a Google product at the time they use a website, or using a private browser, Google still collects, at a minimum, cookies that uniquely identify the individual's browsing session.[8] According to Google's own employees, it uses this data to "connect the dots" and "associate[]" and store the data with the host of other information Google has about the user in its own logs.

127. After the data has been processed and stored in the database, Google uses this data to generate reports to analyze the data from the site. These include reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). Similar to Meta, Google also allows Google Analytics customers to use the data to serve targeted ads.

[8] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

128. In addition to using the data collected through Google Analytics to provide marketing and analytics services for the customers, Google also uses the data collected through Google Analytics for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and profiles on users.

129. Google specifically recognized that "[h]ealthcare" information, like the data obtained through its tracking technology on the Weight Watchers Websites, was particularly useful for its own business model. Google intended to use the data to "grow [its] . . . overall media measurement" and as well as "drive new . . . revenue" by "tak[ing] actions on these insights inside and outside of Google."[9]

**iii. AMPLITUDE**

130. Founded in 2014, Amplitude is a public trading company with a market capitalization of over 1.3 billion as of January 2025. Amplitude is a leading data analytics company that offers a variety of products including its real-time analytics platform called Amplitude Analytics.

131. Amplitude touts the ability of Amplitude Analytics to capture "behavioral insights" from end-users, such as "what users like" and "what keeps them coming back," which "enable companies to quickly take action and drive results" and "maximize sales."

132. Specifically, Amplitude Analytics allows a customer to insert a snippet of code called browser SDK on the customer's websites to track users' activities as they navigate through these websites. As soon as a user takes any action on a webpage that incorporates the browser SDK, this code re-directs the content of the user's communication to Amplitude while the exchange of the communication between the user and website provider is still occurring.

[9] *U.S. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. 2023), ECF No. 1132-2 at 263-64.

133. Indeed, Amplitude states that this technology allows a customer to "capture sessions, page views, clicks, form interactions, file downloads, marketing attribution, [] element interactions," and any other interactions if the customer so chooses, by "creat[ing] new events" that are "specific to [the customer's] business needs and desired analyses."

134. Amplitude also collects identifiable information, such as the User ID, set by the website owner to "track their users."[10] Amplitude also collects device identifiers (e.g., IDFV, UUID, IDFA, AdID, etc.). The Universally Unique Identifier (UUID) Amplitude sets for web-based applications (like the WW Websites) is a persistent identifier that is set by default. Amplitude then takes all of these identifiers to generate an "Amplitude ID" which it "associates . . . with the user and [all] device IDs it has already collected for this user."[11] Using this identifier, Amplitude effectively creates dossiers on individuals by tracking them across all devices.

135. Once this data is intercepted and processed, Amplitude provides a dashboard platform where the customer can access the data, generate analytics reports and charts to gain insights into users' behaviors.

136. Amplitude also uses data received through its tracking technology for its own purposes, including building new products. For example, Amplitude's AI product "Data Assistant" was "[b]uilt" using the events its processed through its tracking technology.

137. To make matters worse, Amplitude's Platform also enables data sharing with even more third parties. Amplitude allows its customers to integrate its Amplitude Analytics with marketing and advertising platforms such as Facebook Ads, Google Ads, TikTok Ads, and

---

[10] *Track unique users*, AMPLITUDE, https://amplitude.com/docs/data/sources/instrument-track-unique-users (last visited January 20, 2025).

[11] *Id.*

Snapchat Ads.[12] Thus, any data received by Amplitude through its tracking technology may have been disclosed to even more third parties through these integrations.

#### iv. Other Tracking Technologies

138. Besides Meta, Google, and Amplitude, Weight Watchers also incorporated Tracking Technologies from other third parties such as New Relic, Braze, Customer.io, and Nextdoor. These additional Tracking Technologies perform substantially similar functions as Meta Pixel, Google Analytics, Google Ads, and Amplitude Analytics.

139. This does not capture the full extent of the third parties whose Tracking Technologies Weight Watchers installed on the WW Websites, which can only be revealed in discovery.

### C. Weight Watchers' Use of These Tracking Technologies

140. Weight Watchers incorporated Tracking Technologies on the WW Websites, including at least Google, Meta, Amplitude, New Relic, Braze, Customer.io, and Nextdoor's Tracking Technologies. Through these Tracking Technologies, Weight Watchers disclosed Plaintiffs' and Class Members' private communications, as well as identifiable information, including unique user and device identifiers and IP Addresses to these third parties. Specifically, Weight Watchers incorporated the Tracking Technologies on the Intro Questionnaire, the Clinic Questionnaire, and the Consultation Questionnaire.

---

[12] *Connect Your Customer Data Stack*, AMPLITUDE, https://amplitude.com/integrations (last visited January 20, 2025).

**i. Intro Questionnaire**

141. As described in Paragraphs101-103, Weight Watchers encouraged users to take the Intro Questionnaire to find a matching program. Weight Watchers incorporated and configured Tracking Technologies on the Intro Questionnaire webpages.

142. As a result, Weight Watchers disclosed users' private communications on the Intro Questionnaire webpages to third parties, including Meta, Google, Amplitude, New Relic, Braze, Customer.io, and Nextdoor. These third parties received, at least, identifiable information (e.g., unique user and device identifiers, such as user ID and device ID) and private communications, including age range, gender, height and weight information, goals for losing weight, the reason why they cannot lose weight previously, whether they had diabetes, and the types of diabetes they had.

143. For example, as depicted in Figures 8-10, because Amplitude Analytics was incorporated in the background of the Intro Questionnaire, Weight Watchers disclosed to Amplitude that the user's goal for losing weight was to "have more energy and stamina" and to "improve my overall health." This private information was transmitted alongside a "user_id" and "device_id" which are unique identifiers that allow Amplitude to distinguish the specific individual (or their device) from all other individuals.

**<u>FIGURE 8</u>**

```
[Amplitude] Page Path: "/us/personalassessment/default/goals-hurdle"
[Amplitude] Page Title: "WW Personal Assessment: A Custom Weight Loss Plan | WW USA"
[Amplitude] Page URL: "https://www.weightwatchers.com/us/personalassessment/default/goals-hurdle"
```

**FIGURE 9**[13]


```
user_agent: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/130.0.0.0 Safari/
user_id: "caf39c42-1589-4370-a1b5-82ec4ff23548"
▼ 1: {user_id: "caf39c42-1589-4370-a1b5-82ec4ff23548", device_id: "1640967350.1736284567",…}
  device_id: "1640967350.1736284567"
```


**FIGURE 10**


```
event_id: 316
▼ event_properties: {Click Event – da-analytics Value: "", Click Event – Category: "prepaywall_assessment",…}
    Click Event – Action: "next"
    Click Event – Category: "prepaywall_assessment"
    Click Event – Label: "What are your goals for losing weight?:To have more energy and stamina;To improve my overall health:
    Click Event – da-analytics Value: ""
```


144. As shown in Figure 11, the information Weight Watchers disclosed to Amplitude also included the individual's gender, height, current weight, and weight goal.

**FIGURE 11**


```
▼ event_properties: {Click Event – da-analytics Value: "", Click Event – Category: "prepaywall_assessment",…}
    Click Event – Action: "next"
    Click Event – Category: "prepaywall_assessment"
    Click Event – Label: "What is your goal weight?:gender M; height 70 in; current weight 250 lbs; goal weight 190 lbs:gtky9:You're in the right place!"
    Click Event – da-analytics Value: ""
```


**ii. Clinic Questionnaire**

145. Similarly, as described in Paragraphs 106-108, Weight Watchers required users to take the Clinic Questionnaire before they can enroll in and purchase the Weight Watchers Clinic services.

146. Weight Watchers incorporated Tracking Technologies on the Clinic Questionnaire webpages. As a result, Weight Watchers disclosed users' communications on the Clinic Questionnaire webpages to third parties, including Google, Amplitude, New Relic, Braze, Customer.io, and Nextdoor. These third parties received, at least, identifiable information (e.g.,

---

[13] The tester's identifiers are redacted to protect this private information.

unique user and device identifiers, like user ID, device ID, guid, auid, and iid) and highly sensitive health-related communications, such as past medication history, past diagnosis history, past suicide attempts, family medical history, and alcohol usage.

147. For example, as depicted in Figure 12, because Amplitude Analytics was incorporated in the background of the Clinic Questionnaire, Weight Watchers disclosed to Amplitude that the user answered the question "Have you used a weight loss medication within the past 3 months?" with an answer "Yes." This private information was transmitted alongside a "device_id" which is a unique identifier that allows Amplitude to distinguish the specific individual's device from that of all other individuals.

**FIGURE 12**


```
▾ events: [,…]
  ▾ 0: {device_id: "2079188919.1734644901", session_id: 1734644902295, time: 1734645840149, platform: "Web",…}
     device_id: "2079188919.1734644901"
     event_id: 49
    ▾ event_properties: {Click Event - da-analytics Value: "", Click Event - Category: "prepaywall_assessment",…}
       Click Event - Action: "next"
       Click Event - Category: "prepaywall_assessment"
       Click Event - Label: "Have you used a weight loss medication within the past 3 months?::Yes"
       Click Event - da-analytics Value: ""
```


148. In the same way, Weight Watchers also disclosed to Amplitude that the user answered the question "Have you ever had any of the following conditions?" by selecting "Pancreatitis," "Glaucoma," and "Type 1 Diabetes." Weight Watchers also transmitted a "user_id" and a "device_id" to Amplitude for it to associate the data with the specific user.

**FIGURE 13**


```
   event_id: 86
 ▾ event_properties: {Click Event - da-analytics Value: "", Click Event - Category: "prepaywall_assessment",…}
    Click Event - Action: "next"
    Click Event - Category: "prepaywall_assessment"
    Click Event - Label: "Have you ever had any of the following conditions?:Pancreatitis;Glaucoma;Type 1 Diabetes:
    Click Event - da-analytics Value: ""
```

**FIGURE 14**


```
user_agent: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/130.0.0.0 Safari/537.36"
user_id: "26a80632-c9c0-4760-a0e5-2432f52a836b"
▼ 1: {user_id: "26a80632-c9c0-4760-a0e5-2432f52a836b", device_id: "2079188919.1734644901",…}
device_id: "2079188919.1734644901"
```


149. Similarly, as shown in Figure 15-16, because Google Ads was incorporated in the Clinic Questionnaire webpages, Weight Watchers disclosed to Google that the user had pancreatitis and is explaining the cause of his/her pancreatitis. This private information was also transmitted alongside the "guid" and "auid" which allow Google to identify the specific individual.

**FIGURE 15**




**FIGURE 16**


```
guid: ON
async: 1
gtm: 45be4cc1v9164540010z877336412za201zb77336412
gcd: 13l3l3l3l1l1
dma: 0
tag_exp: 101925629~102067555~102067808~102081485~102198178
u_w: 3840
u_h: 2160
url: https://www.weightwatchers.com/us/personalassessment/clinical/pancreatitis-cause
ref: https://www.weightwatchers.com/us/personalassessment/?isSequence=true&compound=true
hn: www.googleadservices.com
frm: 0
tiba: WW Personal Assessment: A Custom Weight Loss Plan | WW USA
npa: 0
pscdl: noapi
auid: 1720977457.1734644902
```

150. As another example (Figures 17-18), as a result of Weight Watchers' incorporation of Nextdoor's Tracking Technology on the Clinic Questionnaire webpages, it transmitted to Nextdoor the URL containing the question and a parameter of "true," as well as an "iid" that identifies the user. Nextdoor therefore receives the information that this specific user has weighed more than a certain weight.

**FIGURE 17**




**FIGURE 18**

https://flask.nextdoor.com/pixel?pid=cab6cef4-36ff-42a6-a1ba-3b0022988839&vrs=8.4&ev=PAGE_VIEW&pl=https%3A%2F%2Fwww.weightwatchers.com%2Fus%2Fpersonalassessment%2Fclinical%2Fweighed-more&ndclid=&ndclid_src=0&rf=https%3A%2F%2Fwww.weightwatchers.com%2Fus%2Fpersonalassessment%2F%3FisSequence%3Dtrue&sem=&tm=GTM&iid=078ff9c0-395c-4b59-b7d4-6a6796720aa8&pageid=cdeed487-c135-4ab2-846c-ca46e6423e8c&sessionid=21362c3d-50ce-405e-9bef-0f5f481b99e9&cd=%7B%7D

151. Further, as a result of Weight Watchers' incorporation of Google Ads (i.e. DoubleClick) on the Clinic Questionnaire webpages (Figures 19-20), it transmitted to Google that the individual user has completed the Clinic Questionnaire and made a payment for Weight Watchers' telehealth services. Weight Watchers disclosed this information alongside the "guid"

and "auid" which allow Google Ads to identify the specific individual and serve targeted advertisement to this individual based on this information.

**FIGURE 19**

| | | | | | |
|---|---|---|---|---|---|
| GET | googleads.g.doubleclick.net | /pagead/viewthroughconversion/11... | 14:08:37 | 88 ms | Complete |
| GET | td.doubleclick.net | /td/rul/11259328674?random=1736... | 14:08:37 | 98 ms | Complete |
| GET | googleads.g.doubleclick.net | /pagead/viewthroughconversion/11... | 14:08:38 | 32 ms | Complete |
| GET | td.doubleclick.net | /td/rul/11259328674?random=1736... | 14:08:38 | 47 ms | Complete |
| GET | td.doubleclick.net | /td/rul/11259328674?random=1736... | 14:09:37 | 98 ms | Complete |

**FIGURE 20**

| | |
|---|---|
| guid | ON |
| async | 1 |
| gtm | 45be4cc1v9164540010z877336412za201zb77336412 |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 101925629~102067555~102067808~102081485~102198178 |
| u_w | 3840 |
| u_h | 2160 |
| url | https%3A%2F%2Fwww.weightwatchers.com%2Fus%2Fpersonalassessment%2Fclinical%2Fclinic%2Fcheckout%2Fpayment |
| ref | https%3A%2F%2Fwww.weightwatchers.com%2Fus%2Fpersonalassessment%2F%3FisSequence%3Dtrue |
| label | Uqv7CMDKw_MYEKLx7vgp |
| hn | www.googleadservices.com |
| frm | 0 |
| tiba | WW%20Personal%20Assessment%3A%20A%20Custom%20Weight%20Loss%20Plan%20%7C%20WW%20USA |
| oid | caf39c42-1589-4370-a1b5-82ec4ff23548%3A20250107 |
| value | 400 |
| currency_code | USD |
| bttype | purchase |
| npa | 0 |
| pscdl | noapi |
| auid | 753113802.1736284568 |

### iii. Consultation Questionnaire

152. As described in Paragraphs 111-112, Weight Watchers also required the Weight Watchers Clinic users to take the Consultation Questionnaire before they can schedule an appointment with a clinician and/or obtain drugs.

153. As illustrated in Figures 21-22, because Google Analytics was incorporated in the background of the Consultation Questionnaire, Weight Watchers disclosed to Google that the user was answering a question whether she was "breastfeeding." This private information was transmitted alongside a "sid" which is a unique advertising identifier that allows Google to distinguish the specific individual's session from that of all other individuals.

**FIGURE 21**

| | | | | | | |
|---|---|---|---|---|---|---|
| | POST | www.google-analytics.com | /g/collect?v=2&tid=G-5SWTLH9TS... | 14:21:57 | 108 ms | Complete |

**FIGURE 22**

| | |
|---|---|
| sid | 1736287780 |
| sct | 1 |
| seg | 1 |
| dl | https%3A%2F%2Fapp.joinsequence.com%2Fonboarding%2Fc%2Fvisit-prep%2Fnopp |
| dr | https%3A%2F%2Fapp.joinsequence.com%2Fonboarding%2Fc%2Fvisit-prep%2Fbreastfeeding |
| dt | Sequence |
| en | click |

154. As described in paragraphs 114-138, Weight Watchers not only allowed these third parties to intercept its users' private and health-related information, but to use this data for their own purposes, further compounding Plaintiff's and the Class's privacy injuries.

### D. Plaintiffs and Class Members Do Not Consent to Weight Watchers Disclosure of Their Sensitive Information

155. Plaintiffs and Class Members had no way of knowing that Weight Watchers was disclosing and allowing third parties to intercept their User Data, including sensitive medical information, when they engaged with the WW Websites because the Tracking Technologies were inconspicuously incorporated in the background.

156. This undisclosed conduct is all the more egregious given the nature of the information entered into the WW Websites, e.g., PII, medical history, past medications, past suicide attempts, and other health information. Plaintiffs and Class Members would not expect this information would be disclosed or intercepted without their consent.

157. This is especially true given Weight Watchers' representations that this information would remain confidential and only be used on an as-needed basis. For instance, on the webpage where users make payment for their purchase of Weight Watchers' services and/or programs, Weight Watchers states that "WW may process health related data (e.g. weight history, diabetes)

to the extent necessary for the provision of the tools and function of WW products (e.g. providing your food plan and points budget).” There is no reference to its disclosure of data to unauthorized third parties on this webpage.

158. Weight Watchers did not disclose its sharing of health and other private data in its privacy policies either. Weight Watchers maintains a “Notice of Privacy Practices” specific to its “Weight[]Watchers Clinic” and the “health information” it handles, processes, and collects through this service. This policy states that “[u]nless [the user] gives [Weight Watchers] ***written permission***” (emphasis added) that it will “never share your information for marketing purposes” and will “never sell your information to third parties.” Weight Watchers never obtained written permission to share Weight Watchers users’, including Weight Watchers Clinic users’, health data with third parties.

159. Weight Watcher’s general privacy policy equally fails to mention its disclosure of users’ private data, including their health information. While this policy mentions that Weight Watchers “may collect . . . ‘Health and Fitness Information’” it never discloses that this information will be shared or used by third parties. Indeed, under the later section referring to its use of “Cookies and Similar Technologies” it only vaguely states that Weight Watchers and its “marketing partners, affiliates, or service providers use cookies and similar technologies to analyze trends, administer [the] Website, track users’ movements around the site and interaction with our Services, and ***gather demographic information about our user base as a whole***.” (emphasis added). Nothing in this section mentions that third parties will have access to, let alone use, “Health and Fitness Information” relating to users’ medical conditions, symptoms, and treatments, among other things, or that they would use this data for their own purposes.

160. Based on these representations, reasonable Weight Watchers users reasonably believed their private data, including health information, would not be disclosed or used by third parties.

### E. Plaintiffs and Class Members have a Reasonable Expectation of Privacy in their User Data

161. Plaintiffs and Class Members have a reasonable expectation of privacy in their private and health-related communications on the WW Websites.

162. Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

163. For example, a study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and about the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[14] Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data collected about them by companies is used by companies.[15]

[14] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/?srsltid=AfmBOooZKcKElpRb-k9bvaOyAs93buRiD7f-WN1mFLMcULcWrE2TgAGb.

[15] Brook Auxier, Lee Rainie, et. al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

164. Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data with third parties when prompted.[16]

165. Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.[17]

166. Privacy law experts have expressed concerns about the disclosure to third parties of a users' intimate health data. For example, Dena Mendelsohn—the former Senior Counsel at Consumer Reports on privacy and technology policy—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increase the rate you're charged on loans, and leave you vulnerable to workplace discrimination.[18]

---

[16] Michael Grothaus, *Apple's newst ad perfectly visualizes how App Tracking Transparency stops companies from stalking you*, FAST COMPANY (May 20, 2021), https://www.fastcompany.com/90638821/apples-newest-ad-perfectly-visualizes-how-its-app-tracking-transparency-privacy-feature-stops-companies-from-stalking-you?partner=feedburner&utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+fastcompany%2Fheadlines+%28Fast+Company%29/.

[17] *New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations*, DATAGRAIL, (Oct. 27, 2022), https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/.

[18] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (January 28, 2020), https://www.consumerreports.org/health/health-privacy/what-your-period-tracker-app-knows-about-you-a8701683935/?srsltid=AfmBOorUUdG5IkbJcnIsmAbZSoRMWZC6nJmg8bkddX7GrxxgMwuyRpri.

167. Study also shows that consumers value the privacy of their fitness data. A study published on the Journal of Medical Internet Research found that consumers are significantly less willing to share their fitness information with a company when the company does not provide granular privacy sharing option that allows them to choose "what fitness information to disclose and share and whom to share it with."[19]

168. Weight Watchers' disclosure of Plaintiffs' and Class Members' private communications, including private health data and fitness information, violates Plaintiffs' and Class Members' privacy interests.

**F. Weight Watchers Users' Private Data Has Value**

169. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling user data. That figure is expected to continue to increase, and estimates for 2022 are as high as $434 per user, constituting over $200 billion industry wide.

170. The health data Weight Watchers disclosed is particularly valuable. According to Experian, health data is a "gold mine" for healthcare companies and clinicians.[20] Companies like Pfizer, spend $12 million annually to purchase health data and the medical data industry itself was valued at over $2.6 billion back in 2014.[21] Consumers can also directly sell their fitness data, such as the data collected from their fitness tracking devices, at data marketplaces like Streamr where

[19] Mohamed Abdelhamid, Fitness Tracker Information and Privacy Management: Empirical Study, JOURNAL OF MEDICAL INTERNET RESEARCH (November 16, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8663694/.

[20] Experian Health, *Healthcare data: the value of historical patient data*, EXPERIAN (June 16, 2022), Healthcare data: the value of historical patient data - Healthcare Blog (experian.com).

[21] Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, SCIENTIFIC AMERICAN (February 1, 2016), https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/.

there is consistently a high demand for such data from health insurers, sports equipment manufacturers, researchers, and the alike.[22]

171. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

172. Meta also has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

173. Additionally, health-related data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[23]

174. Had Plaintiffs or Class Members known of Weight Watchers' disclosure of private and health-related information to third parties and its misappropriation and misuse of such data, they would not have paid or would have paid less for the Weight Watchers' services and/or membership subscription.

## **TOLLING**

175. The applicable statutes of limitation have been tolled as a result of Weight Watchers' knowing and active concealment and denial of the facts alleged herein.

---

[22] Gang Liu, *Sell personal fitness data on the Streamr Marketplace *without coding**, STREAMR, https://medium.com/streamrblog/personal-fitbit-data-sell-streamr-marketplace-blockchain-ethereum-3b32c215660c.

[23] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

176. Weight Watchers secretly incorporated the Tracking Technologies on the Weight Watchers Website, providing no indication to users that they were interacting with sites that shared their private and health-related information with third parties.

177. Weight Watchers had exclusive knowledge that the WW Websites incorporated the Tracking Technologies, yet failed to disclose that fact to users, or that by interacting with the WW Websites Plaintiffs' and Class Members' private and health-related information, would be disclosed to and intercepted by third parties.

178. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Weight Watchers' conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable Weight Watchers user that Weight Watchers was disclosing their private communications to third parties, including Meta, Google, and Amplitude.

179. The earliest Plaintiffs and Class Members could have discovered the critical facts of their injury and its cause was shortly before the filing of this Complaint.

180. Weight Watchers was under a duty to disclose the nature and significance of their data sharing practices but did not do so. Weight Watchers is therefore estopped from relying on any statute of limitations under the discovery rule.

181. Additionally, Weight Watchers engaged in fraudulent conduct to prevent Plaintiffs and Class Members from discovering the disclosure of their data to third parties. Weight Watchers misled Plaintiffs and Class Members to believe their private and health-related information would not be disclosed to any third parties through their representations described herein.

182. Plaintiffs and Class Members were not aware that Weight Watchers disclosed their private and health-related information.

183. Plaintiffs and Class Members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Weight Watchers' misconduct by virtue of their fraudulent concealment.

184. Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

185. **Class Definition:** Plaintiffs bring this action on behalf of themselves and other similarly situated individuals (the "Class"), defined as:

> All natural persons in the United States and its territories who, during the Class Period, used the WW Websites, and had their private communications transmitted to third parties via the Tracking Technologies on the WW Websites.

186. Plaintiffs reserve the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

187. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment or preliminary approval of a settlement.

188. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

189. Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently. However, it is estimated that there are thousands of individuals in

the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

190. Typicality. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used the WW Websites and had their personally identifiable information and protected health information disclosed to third parties such as Facebook and Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

191. Adequacy. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

192. Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

(a) Whether Defendant intentionally incorporated the Tracking Technologies;

(b) Whether the WW Websites surreptitiously track personally identifiable information, protected health information, and related communications and simultaneously discloses that information to third parties;

(c) Whether the third parties are third-party eavesdroppers;

(d) Whether Defendant violated Plaintiffs' and Class Members' privacy rights by using Tracking Technologies to communicate users' private and health-related information to third parties;

(e) Whether Plaintiffs and Class Members are entitled to damages under GBL, ECPA, CIPA, or any other relevant statutes.

193. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Violation Of the New York General Business Law § 349, *et seq*

194. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

195. Weight Watchers is considered a "business" under GBL § 349.

196. Weight Watchers' business acts and practices are unfair and deceptive under GBL § 349. New York (as well as other states through their respective unfair and deceptive trade

practices statutes) has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data.

197. Weight Watchers violated GBL § 349 by, among other things, disclosing and allowing third parties to intercept Plaintiffs' and Class Members' sensitive data, including private and health-related information, without consent.

198. Weight Watchers further engaged in unfair business practices because it made material misrepresentations and omissions concerning its disclosure of private data to third parties, which deceived and misled users of the WW Websites.

199. Weight Watchers' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Weight Watchers' secretly disclosing, allowing third parties to intercept, and misusing Plaintiffs' and Class Members' sensitive and highly valuable personal data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiffs and Class Members were completely unaware of Weight Watchers' conduct, they could not have possibly avoided the harm.

200. By unlawfully disclosing and intercepting this data, Weight Watchers has taken money or property from Plaintiff and Class Members. Plaintiffs and Class Members seek all available damages under applicable state consumer protection laws, including actual damages or statutory damages of $50 under GBL § 349.

**SECOND CAUSE OF ACTION**

**Violation Of the Electronic Communications Privacy Act**

**18 U.S.C. § 2510, *et seq***

201. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class. The ECPA prohibits the intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511.415. The ECPA protects both the sending and receipt of communications.

202. The ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

203. At all relevant times, Weight Watchers aided, employed, agreed with, and conspired with third parties, including at least Facebook, Google, and Amplitude, to track and intercept Plaintiffs' and Class Members' internet communications while accessing the WW Websites. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and Class Members.

204. The transmissions of data between Plaintiffs and Class Members and Weight Watchers qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

205. Weight Watchers intentionally inserted an electronic listening device onto Plaintiffs' and Class Members' web browsers that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with Weight Watchers to Meta, Google, Amplitude, and other unauthorized third parties.

206. Weight Watchers willingly facilitated third parties' interception and collection of Plaintiffs' and Class Members' private medical information by embedding the Tracking

Technologies on the WW Websites. Weight Watchers has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

207. The Tracking Technologies constitute "devices" within the meaning of 18 U.S.C. § 2510(5).

208. Weight Watchers failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Class Members' communications with Weight Watchers to undisclosed third parties.

209. The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the communications were intercepted in transit to the intended recipient—Weight Watchers —before reaching Weight Watchers' server.

210. The third parties are not parties to Plaintiffs' and Class Members' communications with Weight Watchers.

211. As demonstrated hereinabove, Weight Watchers violated ECPA by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the WW Websites. Importantly, Meta, Google, Amplitude, and other unauthorized third parties would not have intercepted or received the contents of these communications but for Weight Watchers' actions and incorporations of the Tracking Technologies into the WW Websites.

212. In aiding and permitting third parties to intercept, Weight Watchers had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions including:

(a) The unauthorized disclosure of individually identifiable health information is tortious in and of itself. Weight Watchers intentionally committed a tortious act by disclosing to third parties individually identifiable health information without authorization to do so.

(b) The unauthorized disclosure of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health information. Weight watchers violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization. Weight Watchers' conduct is punishable by increased penalties because its "offense [was] committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." 42 U.S.C. § 1320d-6(b)(3).

(c) A knowing intrusion upon Plaintiffs' and Class Members' seclusion;

(d) Violation of GBL § 349;

(e) Violation of CIPA;

(f) Violation of various state health privacy statutes, including but not limited to the California Confidentiality of Medical Information Act; the California Consumer Privacy Protection Act; and the California Consumer Privacy Act; and

(g) Violation of various state computer privacy and property statutes, including but not limited to the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

213. Plaintiffs and Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Weight Watchers] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs

reasonably incurred pursuant to 18 U.S.C § 2520. This includes monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by Weight Watchers as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**THIRD CAUSE OF ACTION**

**Violation Of the California Invasion of Privacy Act**

**Cal. Penal Code § 631**

214. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

215. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

216. Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any

manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

217. Weight Watchers is a person for purposes of § 631.

218. Under CIPA, a defendant must show it had the consent of all parties to a communication.

219. At all relevant times, Weight Watchers aided, employed, agreed with, and conspired with third parties, including at least Meta, Google, and Amplitude, to track and intercept Plaintiffs' and Class Members' internet communications while accessing the WW Websites. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and Class Members.

220. Weight Watchers intentionally inserted an electronic listening device onto Plaintiffs' and Class Members' web browsers that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with Weight Watchers to Meta, Google, Amplitude and other unauthorized third parties—each of whom constitute a "person" within the meaning of the statute.

221. Weight Watchers willingly facilitated third parties' interception and collection of Plaintiffs' and Class Members' private medical information by embedding the Tracking Technologies on the WW Websites. Weight Watchers has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

222. The Tracking Technologies constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, these tools fall under the broad catch-all category of "any other manner."

223. Weight Watchers failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Class Members' communications with Weight Watchers to undisclosed third parties.

224. The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the communications were intercepted in transit to the intended recipient—Weight Watchers—before reaching Weight Watchers' server.

225. As demonstrated hereinabove, Weight Watchers violated CIPA § 631 by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the WW Websites. Importantly, Meta, Google, Amplitude, and other unauthorized third parties would not have intercepted or received the contents of these communications but for Weight Watchers' actions and incorporations of the Tracking Technologies into the WW Websites.

226. By disclosing Plaintiffs' and Class Members' private and health-related information, Weight Watchers violated Plaintiffs and Class Members statutorily protected right to privacy.

227. As a result of the above violations and pursuant to CIPA Section 637.2, Weight Watchers is liable to Plaintiffs and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000

per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

228. Under the statute, Weight Watchers is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Weight Watchers in the future.

## FOURTH CAUSE OF ACTION

### Common Law Invasion of Privacy – Intrusion Upon Seclusion

229. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

230. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Weight Watchers via the WW Websites.

231. Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Weight Watchers to receive and which they understood Weight Watchers would keep private.

232. Weight Watchers' disclosure of the substance and nature of Plaintiffs' and Class Members' communications to third parties without their knowledge and consent is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

233. Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that Weight Watchers would not install Tracking Technologies on the WW Websites to secretly transmit their communications to unauthorized third parties.

234. Weight Watchers was authorized to receive Plaintiffs' and Class Members' private and health-related information from their respective web browsers when they used the WW Websites, but it was not authorized to force Plaintiffs' and Class Members' web browsers to transmit information to Meta, Google, Amplitude, and other third parties without their consent or authorization.

235. Weight Watchers therefore obtained Plaintiffs' and Class Members' private and health-related information under false pretenses and/or exceeded its authority to obtain such information.

236. As a result of Weight Watchers' actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

237. Plaintiffs and Class Members have been damaged as a direct and proximate result of Weight Watchers' invasion of their privacy and are entitled to just compensation, including monetary damages.

238. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests because of its intrusions upon Plaintiffs' and Class Members' privacy, as well as nominal damages.

239. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant's from engaging in such conduct in the future.

240. Plaintiffs also seek such other relief as the Court may deem just and proper.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

241. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

242. Unjust enrichment is established where (1) the defendant benefitted; (2) at the plaintiff's expense; and (3) equity and good conscience require restitution.

243. Plaintiffs and Class Members conferred a benefit on Weight Watchers in the form of valuable private and health-related information Weight Watchers collected from Plaintiffs and Class Members. Weight Watchers collected, used, and disclosed this information to third parties, including at least Meta, Google, and Amplitude, for its own gain, including for advertising, analytics, and marketing purposes.

244. Weight Watchers knew or appreciated the benefits of such information that it intentionally collected and disclosed to third parties, by virtue of its unauthorized disclosure and use of this data and the valuable analytics, insights, and advertisements generated from it.

245. Plaintiffs and Class Members also conferred a benefit on Weight Watchers in the form of subscription fees for its weight management programs and/or telehealth services.

246. Plaintiffs and Class Members would not have provided their valuable private and health-related information to Weight Watchers or paid for subscription of Weight Watchers' services if they had known Weight Watchers was disclosing their private data to third parties and using it for its own gain.

247. Weight Watchers unjustly retained these benefits at the expense of Plaintiffs and Class Members. Weight Watchers did not provide any commensurate compensation to Plaintiffs

and Class Members in exchange for its disclosure of their private and health-related information for its own gain.

248. The benefits that Weight Watchers derived from Plaintiffs' and Class Members' private and health-related information rightfully belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Weight Watchers to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint. It would also be inequitable for Weight Watchers to retain the subscription fees Plaintiffs and Class Members paid to Weight Watchers for its services as Weight Watchers obtained them through its unfair and unconscionable trade practices.

249. Weight Watchers should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Weight Watchers received from them, and such other relief as the Court may deem just and proper.

**SIXTH CAUSE OF ACTION**

**Violation of the Florida Security of Communication Act**

250. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein and brings this claim individually and on behalf of the proposed Class.

251. The Florida Security of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, *et seq*. The FSCA begins with legislative findings, including:

> On the basis of its own investigations and of published studies, the Legislature makes the following findings…(4) [to] safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

252. FSCA § 934.03(1) imposes liability on any person who (a) "[i]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept

any wire, oral, or electronic communication;" (b) "[i]ntentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when . . . [s]uch device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication . . .;" (c) "[i]ntentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;" and (d) "[i]ntentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection."

253. FSCA § 934.10 provides, in pertinent part, as follows:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.03-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable or declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

254. The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

255. Weight Watchers is a person for purposes of FSCA § 934.03.

256. Under FSCA, a defendant must show it had the consent of all parties to a communication.

257. At all relevant times, Weight Watchers intentionally incorporated third parties' Tracking Technologies (including those from Meta, Google and Amplitude), on WW Websites that, without the knowledge and consent of Plaintiffs and Class Members, tracked and transmitted the substance of their confidential communications with Weight Watchers to Meta, Google, Amplitude and other unauthorized third parties—each of whom constitute a "person" within the meaning of the statute.

258. Weight Watchers intentionally procured third parties, including at least Meta, Google, and Amplitude, to track and intercept Plaintiffs' and Class Members' internet communications via the WW Website, including the contents thereof—*i.e.*, the full-string URLs of webpages visited, the medical information submitted via forms or during registration, and more. Such information not only constitutes protected health information, but it also represents the substance, import, and meaning of the communications Plaintiffs and other Class Members had with Weight Watchers via the WW Websites.

259. Weight Watchers intentionally disclosed to these third parties, including at least Meta, Google, and Amplitude, the contents of Plaintiffs' and Class Members' internet communications via the WW Website, knowing that these communications were obtained through the interception by third parties' Tracking Technologies that Weight Watchers itself incorporated on the WW Website.

260. Weight Watchers intentionally used the contents of Plaintiffs' and Class Members' internet communications via the WW Websites for its own benefit, including for advertising,

analytics, and marketing purposes, knowing that these communications were obtained through the interception by third parties' Tracking Technologies that Weight Watchers itself incorporated on the WW Websites.

261. Plaintiffs and other Class Members had a reasonable expectation of privacy in the electronic communications they had with the WW Websites based on, amongst other things, the nature and sensitivity of the categories of information communicated to Weight Watchers.

262. Weight Watchers failed to disclose, and continues to fail to disclose, its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Class Members' communications with Weight Watchers to undisclosed third parties.

263. The private information that Weight Watchers transmitted constitutes PHI.

264. As demonstrated hereinabove, Weight Watchers violated the FCSA by procuring third parties to intercept its users' online communications in real time as they were made via the WW Websites, disclosing these communications to the third parties through the Tracking Technologies, and using these communications for its own business purposes. Importantly, Meta, Google, Amplitude, and other unauthorized third parties would not have intercepted or received the contents of these communications but for Weight Watchers' actions and incorporations of the Tracking Technologies into the WW Websites.

265. By intercepting, disclosing, and using Plaintiffs' and Class Members' private and health-related information, Weight Watchers violated Plaintiffs' and Class Members' statutorily protected privacy rights.

266. As a result of the above violations and pursuant to FSCA § 934.10, each Plaintiff and Class Member is entitled to actual damages or liquidated damages of $1,000 or $100 per day

for each day of violation, whichever is higher.

267. Under the statute, Weight Watchers is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Weight Watchers in the future.

## RELIEF REQUESTED

Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court grant the following relief:

(a) Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

(b) A declaratory judgment that Weight Watchers violated: (1) the New York General Business Law; (2) the Electronic Communications Privacy Act; (3) the California Invasion of Privacy Act; (4) the Florida Security of Communications Act; (5) Plaintiffs' and Class Members' privacy rights as provided at common law; and (6) Plaintiffs' and Class Members' rights to restitution under common law;

(c) An order enjoining Weight Watchers from engaging in the unlawful practices and illegal acts described therein; and

(d) An order awarding Plaintiffs and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) nominal damages; (4) restitution; (5) reasonable attorneys' fees and expenses and costs of suit; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury for all the claims asserted in this Complaint so triable.

Dated: May 1, 2026

By: _/s/William J. Edelman_

William J. Edelman (*pro hac vice*)
Gary M. Klinger (*pro hac vice*)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel. 866.252.0878
wedelman@milberg.com
gklinger@milberg.com

Christian Levis
Amanda Fiorilla
Rachel Kesten
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

Vicki J. Maniatis, Esq.
**MILBERG PLLC**
405 East 50th Street
New York, New York 10022
Phone: (212) 594-5300
vmaniatis@milberg.com

*Attorneys for Plaintiffs*